# DART DRUG CORPORATION

v.

# CORNING GLASS WORKS.

Civ. No. 72–664–W.

United States District Court,
D. Maryland.

Oct. 29, 1979.

John F. Graybeal, Michael Fischer, Jay N. Varon, Foley, Lardner, Hollabaugh & Jacobs, Washington, D. C., for plaintiff; A. Jerome Diener, A. David Gomborov, Gomborov, Steinberg, Schlachman & Harris, Baltimore, Md., of counsel.

Geoffrey S. Mitchell, Christopher R. West, David R. Owen, Semmes, Bowen & Semmes, Baltimore, Md., for defendant.

## MEMORANDUM OPINION

WATKINS, Senior District Judge.

### I

### *Procedural History*

Plaintiff Dart Drug Corporation (Dart) filed a Motion to Compel Discovery in this antitrust action on November 27, 1973. Paper No. 27. The original motion sought to compel answers to Interrogatories 23, 24, 34, 35 and 36 and responses to Requests to Produce Nos. 10 and 15. A hearing was held on this motion on December 20, 1973. The Court then held the matter *sub curia* while awaiting additional material from the parties.[1] On July 2, 1975 plaintiff filed a Modification of the Motion to Compel which in fact withdrew the motion except as to Request to Produce No. 15.[2] Paper No. 54.

The motion, as modified, sought to have the request be deemed to cover relevant material brought into existence up to the date of decision.

On the same day that plaintiff filed its Modification of the Motion to Compel, it also filed a Second Amended Complaint. Paper No. 56. Defendant Corning Glass Works (Corning) duly answered the complaint and responded to the Modification of the Motion to Compel. Plaintiff replied to this response on August 1, 1975. A conference was held regarding this motion on June 23, 1978.

The parties filed supplemental memoranda on the Motion to Compel following the conference. Defendant argued there for the first time that plaintiff was barred from recovery on its monopolization and price-fixing claims under the rule announced by the Supreme Court in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). This Court noted the possible relevance of the *Illinois Brick* case to the resolution of the pending motion in an August 11, 1978 letter sent to counsel on both sides. Paper No. 66.

On October 3, 1978 defendant filed a Motion to Dismiss Counts Four and Five of the Second Amended Complaint.[3] Paper No. 68. Most of the materials sought in Request to Produce No. 15 are relevant only

---

1. During 1974 the Court disposed of several other motions pending in this case.

2. The plaintiff indicated in its memorandum accompanying the Modification of the Motion to Compel that it might wish to renew its Interrogatories 35 and 36 and its Request to Produce 10. Interrogatory 34 was "deferred" and plaintiff reserved the right to renew its motion as to that interrogatory. Nevertheless the Motion to Compel before the Court at the present time is directed only to Request to Produce 15. This request is as follows:

> 15. All documents consisting of or relating to any studies, surveys, analyses or evaluations of:
> A. The market within which glass and glass ceramic utensils for the cooking, storage and serving of food are sold and identifying any other products which may or may not be competitive;

B. Products competitive with "Corning's products";
C. The companies engaged in the manufacture of such competitive products, their sales and market shares;
D. Competitive and market conditions in the industry in which "Corning's products" are sold;
E. Corning's market share and competitive role in the industry in which "Corning's products" are sold.

Plaintiff's Request to Produce, Paper No. 13, April 13, 1973.

3. Defendant filed this motion without reference to any federal rule. The grounds for the motion, more fully addressed *infra*, rest on the argument that even if plaintiff's allegations regarding Corning's antitrust violations are true, plaintiff, as an indirect purchaser from defendant, is barred from recovery by the "indirect purchaser" rule announced in *Illinois Brick*,

to Count Four of the Complaint.[4] The resolution of plaintiff's Motion to Compel is therefore dependent initially on the disposition of defendant's Motion to Dismiss. The Court accordingly turns its attention first to the pending Motion to Dismiss.[5]

## II

### Motion to Dismiss

#### A. Introduction

The standard under which the Court must test the complaint on a 12(b)(6) motion is clear. The complaint must be found sufficient to withstand a motion to dismiss for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–6, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Defendant bases its Motion to Dismiss upon a single ground. It argues that plaintiff is foreclosed from bringing Counts Four and Five under Section 4 of the Clayton Robinson-Patman Act. The materials sought in the first three segments of this request relate only to defendant's competitors and the product market within which defendant operates. Plaintiff offers no theory as to the relevance of such documents to a Robinson-Patman Act price discrimination claim.

The proof of a claim of price discrimination under Section 2(a) of the Robinson-Patman Act requires a showing that "the effect of [the] discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives benefit of such discrimination, or with customers of either of them." Plaintiff alleges that the line of commerce in which competition is injured is plaintiff's own; hence plaintiff's claimed injury. Although its complaint is not a model of clarity, it is apparent that plaintiff nowhere alleges that the discrimination in prices by defendant itself *tends to create* the monopoly which defendant allegedly enjoys. Rather, plaintiff in its memoranda claims that defendant is able to discriminate because of its alleged *existing* monopoly power. It is, in fact, irrelevant to this type of Robinson-Patman Act claim that a defendant is a monopolist. Therefore, the documents sought in the first three segments of Request to Produce No. 15 relate only to Counts Four and Five.

Sections D and E do appear directly relevant to plaintiff's First, Second and Third Causes of Action. However, plaintiff has maintained consistently that the Motion to Dismiss is irrelevant to the entire Motion to Compel and that the Motion to Compel should be granted in its totality. Especially in light of such vehement insistence on the consideration of the motion as a whole, the Court here will treat the plaintiff's Motion to Compel only after resolving the Motion to Dismiss Counts Four and Five, to which the greater portion of the materials sought in the Motion to Compel are relevant.

This argument clearly identifies the motion as one under F.R.Civ.P. 12(b)(6) for "failure to state a claim upon which relief can be granted."

Rule 12(b) provides that a motion raising any of its defenses, including failure to state a claim, "shall be made before pleading if a further pleading is permitted." Corning made this motion after pleading was completed. *See* F.R. Civ.P. 7(a). Therefore the motion is technically untimely. However, the Court notes that the grounds for this motion were not available, at least in the form of the Supreme Court's *Illinois Brick* decision, until two years after defendant's Answer to the Second Amended Complaint was due. F.R.Civ.P. 12(h)(2) provides that a Rule 12(b)(6) defense may be raised in any pleading under 7(a) or in a motion for judgment on the pleadings or at trial. Although these are the only vehicles mentioned in the Rule, courts have exercised their discretion to hear a post-answer motion to dismiss. *Albachten v. Corbett*, 156 F.Supp. 863, 864 (S.D.Cal. 1957) (court granted post-answer motion to dismiss as exercise of discretion). *See Horwitz v. Food Town, Inc.*, 241 F.Supp. 1, 2 (D.La.1965), *aff'd per curiam*, 367 F.2d 584 (5 Cir. 1966) (treated as one ground in motion for summary judgment). It is an appropriate exercise of discretion to entertain a motion to dismiss for failure to state a claim here, where the grounds offered for the motion were not available at the time the 12(b)(6) motion was due under Rule 12(b). A complaint is always vulnerable to a challenge for legal sufficiency. *McLaughlin v. Curtis Publishing Co.*, 5 F.R.D. 87 (S.D.N.Y. 1943). Under Rule 12(h) this argument could be raised in a judgment on the pleadings or at trial; it is far more efficient to treat the arguments prior to more extensive discovery.

4. Plaintiff argued in a September 5, 1978 letter memorandum styled by the Clerk of Court "Supplemental Memorandum of Plaintiff regarding Motion of Plaintiff to Compel Production of Documents," Paper No. 67, that the documents sought in this request to produce (*supra* at n.2) were also relevant to plaintiff's price discrimination counts brought under the

5. The Court has determined that no further hearing is necessary. Local Rule 6.

Act, 15 U.S.C. § 15, against defendant because plaintiff, as an indirect purchaser from defendant, can prove no "injury to business or property" as required by that section under the indirect purchaser rule set forth by the Supreme Court in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).[6]

In *Illinois Brick* the State of Illinois and 700 municipalities brought a treble damage action under Section 1 of the Sherman Act, 15 U.S.C. § 1, against concrete block manufacturers, alleging that these manufacturers had engaged in a combination and conspiracy to fix the prices of concrete block. Plaintiffs argued that the overcharges resulting from this price-fixing had been passed on to them through the distributional scheme because the overpriced concrete block eventually resulted in overpriced buildings purchased by the plaintiffs.

The Supreme Court rejected this offensive use of the "pass-on" theory of damages. The Court reaffirmed its holding in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) in which it rejected the defensive use of the pass-on theory, and held that

> the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party "injured in his business or property" within the meaning of [Section 4 of the Clayton Act].

431 U.S. at 729, 97 S.Ct. 2061. It is undisputed that plaintiff here is an indirect purchaser as to defendant, and indeed, this fact constitutes the heart of plaintiff's claims for relief.[7] *See, e. g.*, Plaintiff's Second Amended Complaint, Paper No. 56, July 2, 1975. The Court must consider whether plaintiff's status is dispositive as to the question before it.

**B.** *Plaintiff's Fourth Cause of Action*

Most of the discussion by the parties focuses on Plaintiff's Fourth Cause of Action (Monopolization). This count states *in toto*:

> 15. Beginning several years ago, the exact date being unknown to plaintiff, and continuing up to and including the date of filing of this Second Amended Complaint, the defendant, together with certain co-conspirators, has engaged in an unlawful combination to monopolize and has attempted to and has monopolized that part of intra- and interstate trade and commerce consisting of the manufacture, distribution and sale of glass and glass ceramic utensils for the cooking and storage of food which have the characteristic of being resistant both to extreme high and low temperatures while at the same time having decorative qualities rendering them useful and desirable for the serving of food, in violation of Section 2 of the Sherman Act, 15 U.S.C. Sec. 2, and Section 38(a)(2) of the Maryland Antitrust Act. The attempt, combination and monopolization charged in this paragraph was, in the State of Maryland, for the purpose of excluding competition or of controlling, fixing or maintaining

---

6. Defendant flatly states in its Motion to Dismiss: "So long as Plaintiff has never purchased products directly from Corning, the Plaintiff is not entitled to raise Sherman Section 1 or Section 2 claims under Section 4 of the Clayton Antitrust Act and Section 41(2) of the companion Maryland statute. [footnote omitted]." Paper No. 68, at 4.

Section 4 of the Clayton Act, 15 U.S.C. § 15 provides:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

7. Plaintiff's claims are premised on allegations that defendant permits certain of plaintiff's competitors on the retail level to purchase directly from defendant, while it does not afford plaintiff the same opportunity. Thus plaintiff has access to defendant's products only by purchasing them from intermediaries, i. e., wholesale distributors. Plaintiff claims that its exclusion from this wholesale distribution level results in discrimination in prices and services which it receives and in the availability of particular lines of merchandise which plaintiff and its competitors sell in the retail market.

prices in trade or commerce. Plaintiff was damaged by the violation charged in this paragraph.

 The only other allegation of monopolization in the complaint appears in paragraph 1 where plaintiff states:

Defendant has attempted to, has combined with others to and has monopolized that part of intra- and interstate commerce herein specified, in violation of the Sherman Act and the Maryland Antitrust Act.

Sherman Act § 2 provides that it is unlawful to:

monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . .

The majority of the allegations in plaintiff's Fourth Cause of Action relate to Corning's monopoly power. It is well-settled that possession of monopoly power[8] in a relevant market does not by itself constitute a violation of Sherman Act § 2. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 at 273 (2 Cir. 1979) (Section 2 does not prohibit monopoly *simpliciter*). *See* J. Von Kalinowski, *Antitrust Laws & Trade Regulation*, ¶ 802(3), at 8–41 (1979). Nevertheless, two types of conduct mentioned in the complaint may form a basis for a claim under Sherman Act § 2.

1. *Defendant's Conduct*

a. *Plaintiff's Claim of Competitive Advantage*

Monopoly power, even if lawfully acquired, may not be wielded to prevent or impede competition. *Berkey Photo*, at 274. This rule is generally understood to prevent a monopolist from using monopoly power in one market to gain a competitive advantage in another, even when no attempt is made to monopolize the second market. *Id. See Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *Eastman Kodak Co. v. Southern Photo Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927). Plaintiff nowhere in its complaint alleges that defendant competes on the wholesale distributor or retailer level and therefore does not make a claim based on this theory. There is, however, some case law to the effect that a monopolist who engages in conduct similar to that alleged in plaintiff's First, Second and Third Causes of Action and in Paragraphs 1, 8 and 9 violates Section 2 of the Sherman Act. Thus, certain discriminatory conduct by a monopolist which injures competition in a market has been held to constitute an abuse of monopoly power sufficient to state a claim under Section 2 even if the monopolist does not itself compete in that market. *See Peelers Co. v. Wendt*, 260 F.Supp. 193 (W.D.Wash.1966). *Cf. La Peyre v. F.T.C.*, 366 F.2d 117 (5 Cir. 1966). *See generally* L. Sullivan, *Antitrust* § 47 at 124 n.35, § 48 at 131 (1977).

 It is clear from plaintiff's memoranda in opposition to the motion to dismiss that plaintiff considers its complaint to have alleged defendant's discriminatory policies as at least one type of conduct violative of Section 2 of the Sherman Act.[9]

---

**8.** Monopoly power is the power to control market prices or exclude competition in the relevant market. *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Plaintiff alleges that Corning has such power in a carefully defined market.

**9.** *See* Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss, Paper No. 70, October 30, 1978; Plaintiff's Supplemental Memorandum in Opposition to Defendant Corning's Motion to Dismiss, Paper No. 73, September 18, 1979.

Plaintiff also argues in its Memorandum in Opposition to Defendant's Motion to Dismiss, Paper No. 70, October 20, 1978, that "[defend-

ant's] products, Corning ware and Pyrex cooking utensils, are unique; Corning and its distributors are the only source of supply." Paper No. 70 at 2. Plaintiff continues:

In a perfectly competitive situation, Dart could obtain products similar to Corning products from other companies and could effectively compete with [other retailers] by selling products similar to Corning ware and Pyrex cooking utensils. Dart is unable to make such a competitive response in this situation, however, simply because there are no such products.

*Id.* A firm which holds a lawful monopoly by virtue of ownership of a unique resource is

However, plaintiff makes no factual allegations within the count at issue which would by themselves suggest such a theory of recovery. Unlike the other four causes of action in plaintiff's Second Amended Complaint, the "monopolization" count provides no supplementary paragraph alleging that "[t]he aforesaid violation has occurred by virtue of the [following] facts" along with a recitation of defendant's allegedly unlawful conduct. Rather, such a theory of recovery can be found within the complaint only by means of the most sympathetic perusal of the pleading.

Nevertheless, it is just such a sympathetic perusal that this Court is called upon to make in deciding a Rule 12(b)(6) motion. In *Wolman v. Tose*, 467 F.2d 29 (4 Cir. 1972) the Fourth Circuit stated:

> Under the liberal rules of federal pleading, a complaint should survive a motion to dismiss if it sets out facts sufficient for the court to *infer* that all the required elements of the cause of action are present. 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216 (1969).

467 F.2d at 33 n.5 (emphasis in original). Judge Harvey of this Court noted in *Amstar Corp. v. M/V Alexandros T.*, 431 F.Supp. 328, 338 (D.Md.1977) that "[m]odern rules for pleading in the federal courts do not require that any particular form be used so long as a defendant is adequately apprised of the nature of the claim being asserted."

■ Here the plaintiff's complaint clearly puts defendant on notice as to plaintiff's claim that defendant's discriminatory conduct was unlawful and caused plaintiff injury. It also puts defendant on notice that plaintiff claims injury by reason of a violation of Section 2 of the Sherman Act. Although defendant has not been specifically apprised of plaintiff's claim that, in part, the same behavior violates both the Robinson-Patman Act and Section 2 of the Sherman Act, the Court fails to see how defendant can be prejudiced by this omission.

The elements necessary for the Sherman Act claim alone are specifically alleged in plaintiff's Fourth Cause of Action. Defendant's discriminatory conduct, which is the element common to both of these theories of recovery, is specifically alleged in plaintiff's first three causes of action. Moreover, the sparse law on this topic indicates that the plaintiff must meet the same burden of proof as to the effect of such conduct on the market for recovery under Section 2 of the Sherman Act as is required for recovery under the Robinson-Patman Act. *See Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 854-5 (9 Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). Thus, defendant would meet that element of the Sherman Act claim simply by defending against the specific allegations in plaintiff's first three causes of action. The Court finds that the complaint here sets forth facts sufficient for the Court to infer the existence of all of the required elements of this type of claim under Section 2 of the Sherman Act.[10] It is clear that no prejudice will

---

guilty of monopolization if it exploits its control over that resource by excluding its competitors at a different level from access to that essential resource. *See, e. g., Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Poster Exchange, Inc. v. National Screen Service Corp.*, 431 F.2d 334 (5 Cir. 1970), *cert. denied*, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971). Two elements common to this line of cases are that the monopolist competes at another level with those foreclosed from access, and that those foreclosed are thereby excluded from the market in which they would compete with the monopolist. Although the language quoted above might be seen to raise this theory, the facts alleged in the complaint fail to support such a claim. It appears from the face of the complaint that plaintiff is not totally foreclosed from obtaining defendant's allegedly unique product. Defendant is not alleged to compete with plaintiff at any level, and plaintiff would not be forced out of the retail market by the total unavailability of defendant's product. Plaintiff has therefore not stated a claim under this theory. *See Shapiro v. General Motors Corp.*, 472 F.Supp. 636, 645–46 (D.Md.1979) ("bottleneck" theory rejected when plaintiffs did not compete with alleged monopolist).

**10.** The Court of course expresses no opinion as to the merits of this claim. Indeed, there is little case law regarding such a theory of recov-

result from this inference, particularly where defendant answered the Second Amended Complaint two years prior to this motion and never moved for a more definite statement or other similar relief. *See* Answer to Second Amended Complaint, Paper No. 59, July 29, 1975, ¶ 15 (general denial of Fourth Cause of Action).[11]

### b. *Plaintiff's Claim of Price-Fixing*

■ Monopoly power is the power to exclude competition or to fix prices, and the exercise of such power to fix prices violates Section 2 of the Sherman Act. *See United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. E. I. Du Pont De Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (Cellophane Case). Plaintiff alleges in its Fourth Cause of Action that:

the attempt, combination and monopolization was, in the State of Maryland, for the purpose of excluding competition or of controlling, fixing or maintaining prices in trade or commerce.

This language adequately apprises Corning of a claim of injury by reason of price-fixing. Indeed, the grounds of the instant motion to dismiss reveal that defendant expects plaintiff to attempt to prove price-fixing. As defendant contends in its Supplemental Memorandum in Support of Motion to Dismiss, the rule announced in *Illinois Brick* was developed to prevent indirect purchasers of price-fixed commodities from proving that the illegal overcharges were passed on to them, thereby injuring them in their business or property.

Therefore, the Court must consider the effect of the rule announced in *Illinois Brick* with respect to two different claims of unlawful conduct brought under Section 2 of the Sherman Act; i. e., discriminatory policies and price-fixing. Because the Court finds that the application of the *Illinois Brick* rule differs with respect to these two claims, the Court will address the merits of the motion to dismiss as to each separately.

### 2. *Illinois Brick's Application to Claims of Discriminatory Conduct*

A review of the Supreme Court's rationale in *Illinois Brick* will facilitate evaluation of the applicability of its holding to the discriminatory conduct claim. The antitrust violation claimed in that case was that defendants had fixed the price of concrete block above the competitive market price, thereby producing an "overcharge." The plaintiffs had not purchased blocks from the defendants, but rather had purchased buildings constructed with those blocks from others further down the chain of distribution. The plaintiffs sought to introduce evidence that the "overcharge" had been "passed on" to them by the middlemen, thereby causing the plaintiffs the "injury to business or property" required under Section 4 of the Clayton Act.

The Supreme Court refused to allow plaintiffs to introduce evidence of passed-on overcharges. In reaching this decision the Court first considered whether to permit the use of the "pass-on" theory offensively while maintaining *Hanover Shoe's* prohibi-

ery. Novel legal claims are particularly inappropriate for dismissal if, as here, the Court can infer the existence of facts comprising all of the required elements. *See* 5 C. Wright & A. Miller, Federal Practice & Procedure § 1357 at 603 (1969). A proper test for such a claim is a motion for summary judgment after discovery sufficient to uncover relevant facts has been completed.

11. Defendant has previously made a motion for partial summary judgment as to this same cause of action as it was alleged in plaintiff's First Amended Complaint. Paper No. 36, Feb-

ruary 4, 1974. The grounds alleged in that motion were that plaintiff failed to respond to defendant's interrogatories which sought more specific information as to the count. This motion did not constitute a proper attack on the pleading. The motion was denied without prejudice in a ruling from the bench on April 9, 1974. A motion for a more definite statement, indicating that defendant could not plead without further factual allegations, was not made and the general denial entered indicates that none were deemed necessary, a judgment with which the Court is in accord.

tion against its defensive use.[12] The Court held that any rule as to the use of the theory must apply equally to both plaintiffs and defendants, because allowing its offensive use alone would create an unacceptable risk of multiple liability and inconsistent judgments. *Id.*, at 730, 97 S.Ct. 2061. This risk results from the fact that both a direct purchaser and an indirect purchaser might seek to recover for overcharges under the Sherman Act, but, after *Hanover Shoe*, the defendant would be prevented from proving that any of the overcharge had been passed on and would thus be subject to overlapping recoveries. The Supreme Court considered and rejected the contention that procedural devices such as interpleader or compulsory joinder could insure against these undesirable results. *Id.* at 738–9, 737 n.18, 97 S.Ct. 2061.

After concluding that the use of pass-on could be permitted symmetrically, if at all, the court considered whether to abandon or retreat from the *Hanover Shoe* rule so as to permit both offensive and defensive use of the pass-on theory. It reaffirmed its holding that, except in certain limited circumstances, only direct purchasers could recover for overcharges unlawful under the antitrust laws.

Two reasons were given for this holding. The Court was most concerned with the evidentiary complexities and uncertainties inherent in any demonstration that all or part of an overcharge had been passed on. The effort required for such a demonstration was described as:

> attempts to trace the effects of the overcharge on the purchaser's prices, sales, costs, and profits, and of showing that these variables would have behaved differently without the overcharge.

*Id.* at 725, 97 S.Ct. at 2064 (discussing *Hanover Shoe*, 392 U.S. at 492–3, 88 S.Ct. 2224).

The Court noted that, while economic theory provides a formula for determining how much of the overcharge was passed on, such an analysis rests on "an array of simplifying assumptions" and also requires more precise and reliable knowledge of the elasticities of supply and demand in the relevant market than is available through use of statistical models. *Id.*, at 741–2, 97 S.Ct. 2061. However, the Court found even more compelling the fact that, even if these technical problems could be resolved, the model could not predict the behavior of overcharged direct purchasers with any certainty. The Court explained:

> Overcharged direct purchasers often sell in imperfectly competitive markets. They often compete with other sellers that have not been subject to the overcharge; and their pricing policies often cannot be explained solely by the convenient assumption of profit maximization.

*Id.* at 742, 97 S.Ct. at 2073. The Court thus appeared most troubled by the speculative character of the proof regarding the amount of overcharge passed on. It noted that these uncertainties were multiplied in a case involving offensive use of pass-on, because this demonstration would have to be "repeated at each point at which the price-fixed goods changed hands before they reached the plaintiff." *Id.* at 732–33, 97 S.Ct. at 2068.

The second reason advanced by the Court in support of its holding was that private enforcement of the antitrust laws would be seriously undermined if use of pass-on theory was permitted. The Court reasoned:

> The apportionment of the recovery throughout the distribution chain would increase the overall costs of recovery by

---

**12.** "Passing-on is the 'process whereby a businessman who has been overcharged adjusts his own price upward to reflect the overcharge.'" Note, "Scaling the *Illinois Brick* Wall: The Future of Indirect Purchasers in Antitrust Litigation," 63 Cornell L.Rev. 309 n.2 (1978) *quoting* McGuire, "The Passing-On Defense and the Right of Remote Purchasers to Recover Treble Damages Under Hanover Shoe," 33 U.Pitt L.Rev. 177, 181 (1971). The defensive use of this theory involves proof by defendants that a plaintiff was not injured by any overcharge because it was passed on to one further down the chain of distribution. Offensive use of the theory involves proof by plaintiff, an "indirect purchaser," i. e., one who does not buy directly from the antitrust violator, that he was injured by the overcharge because it was passed on to him by an intermediary in the chain of distribution.

injecting extremely complex issues into the case; at the same time such an apportionment would reduce the benefits to each plaintiff by dividing the potential recovery among a much larger group. Added to the uncertainty of how much of an overcharge could be established at trial would be the uncertainty of how that overcharge would be apportioned among the various plaintiffs. This additional uncertainty would further reduce the incentive to sue. The combination of increasing the costs and diffusing the benefits of bringing a treble-damages action could seriously impair this important weapon of antitrust enforcement.

*Id.* at 745, 97 S.Ct. at 2074–2075. The Court concluded that the strong policy of encouraging private enforcement would be

> better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it.

*Id.* at 746, 97 S.Ct. at 2075.

▮ Defendant argues that the *Illinois Brick* holding precludes an "indirect purchaser" from bringing suit for any claim under Section 4 of the Clayton Act. The foregoing review of the rationale of *Illinois Brick* makes it abundantly clear that that case bars suit only in those situations where plaintiff's injury is premised on an "overcharge" and where, in order to prove that injury, plaintiff must also demonstrate that persons in the chain of distribution between plaintiff and the antitrust violator passed on the overcharge to plaintiff. Neither the speculative and complex nature of the proof nor the disincentive to sue resulting from the uncertain apportionment of a recovery exist where these two elements are lacking. Therefore defendant's contention can be correct only if every claim brought by one who does not purchase directly from an antitrust violator raises these elements. This is clearly not the case. *Cf. Mid-West Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573, 585 and n. 47 (3 Cir. 1979) (monopolization and group boycott claims present different problems in the proof of damages than are presented by overcharge claims). In fact, the case at bar raises a claim which illustrates this point.

▮ One of plaintiff's claims under Section 2 of the Sherman Act is that defendant abused its alleged monopoly position by engaging in discriminatory conduct which injured competition in plaintiff's market and thereby injured plaintiff in its business or property. In order to prove this injury plaintiff will have to show discrimination in the prices, services, and products which defendant made available to plaintiff in contrast to those offered to plaintiff's competitors. Proof of this claim does not in any way involve proof that defendant set prices of its goods above the competitive market, resulting in an "overcharge," or proof that any such overcharge was passed on to plaintiff. Rather, it is defendant's discriminatory conduct which will support the claim, and to the extent that plaintiff was the victim of such conduct, it is the one who was directly injured. Unlike the situation addressed by *Illinois Brick*, plaintiff here is the only person who can effectively present this claim. No one else has standing to claim that plaintiff was injured by defendant's alleged abuse of its monopoly power.

The damages available for a successful claim of the type here presented are compensatory damages for the proven competitive injury, trebled, and such equitable relief as is required to prevent further abuse of the monopoly power. Measuring these damages will not require proof of the amount of any passed-on overcharge because "pass-on" is irrelevant to the case. It is true that compensatory damages might include the amount charged plaintiff over the price offered to its competitors. However, proof of those damages would not involve proof of the amount of the overcharge which was passed down the chain of distribution, but instead simply a comparison of the relative prices paid by plaintiff and its competitors. The fact that plaintiff does not purchase directly from the defendant is therefore the central focus of the claimed injury rather than an additional proof problem.

No court has held that *Illinois Brick's* rule applies in such a case. Although it is true that plaintiff is an "indirect purchaser" suing under Section 4 of the Clayton Act, this Court concludes that the holding in *Illinois Brick* does not mandate dismissal of this part of its monopolization claim.[13]

### 3. *Illinois Brick's Application to Claims of Price-Fixing*

█ Price-fixing is the other conduct by which defendant allegedly violates Section 2 of the Sherman Act. To the extent that plaintiff will seek to prove injury incurred by reason of prices generally set above the competitive market level, the rule announced in *Illinois Brick* applies.[14] Plaintiff does not purchase directly from defendant, and could therefore only be injured by such an overcharge if it was passed on to plaintiff.

Plaintiff contends however that it is not barred by the *Illinois Brick* holding because it falls within certain limited exceptions set forth by the Supreme Court in that case. These are generally referred to as the "ownership or control" exception and the "cost-plus contract" exception. Plaintiff also argues that even if it cannot recover damages for its price-fixing claim under Section 4 of the Sherman Act, it is not barred from seeking injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.[15]

#### a. *Exceptions*

█ The Supreme Court acknowledged in *Illinois Brick* that the holding would not be applied in certain limited circumstances. It characterized these cases as those "in which market forces have been superseded." 431 U.S. at 736 n. 16, 97 S.Ct. at 2070 n. 16. One example which the Court noted briefly was "where the direct purchaser is owned or controlled by its customer." *Id.* The Court mentioned this example in the context of a discussion of appropriate defensive use of the pass-on theory and it is only in relation to that defense that a party would seek to prove that the purchaser was owned or controlled by its customer. In such a case the purchaser would theoretically not absorb the loss from the overcharge but would rather pass it on to its parent customer.

Although the Supreme Court spoke only in terms of an exception permitting the pass-on *defense*, other portions of the opinion make clear that the same exception must be available to permit a pass-on *offense*. The Court emphasized that the pass-on theory was to be available, if at all, only where it could be used equally by both

---

13. A situation analogous to that confronted by the Supreme Court in *Illinois Brick* would be presented if a supplier or customer of plaintiff claimed injury because of discrimination directed against plaintiff. However, in that situation the question raised would be whether plaintiff had standing to sue, i. e., whether or not plaintiff was too remotely injured to be entitled to recover. In contrast, the Supreme Court acknowledged in *Illinois Brick* that indirect purchasers might actually be injured by an overcharge, but for policy reasons the Court foreclosed such purchasers from attempting to prove injury. Such a prophylactic rule differs from the usual case-by-case analysis required in a determination of standing. In the instant case plaintiff alleges injury by reason of discrimination directed at itself, rather than that prices discriminatory to another were "passed on" to it. Therefore this case also does not raise a standing issue.

14. Such a theory of recovery must be initially distinguished from that based on alleged price discrimination. In order for the *Illinois Brick*

rule to apply, plaintiff must seek to show across the board overcharges which were passed on to plaintiff through the chain of distribution. As noted *supra*, price discrimination involves proof that competitors were charged different prices. Although such proof suggests that plaintiff was "overcharged," it does not involve proof of pass-on of a general overcharge fixed by defendant. Only the latter proof is foreclosed by *Illinois Brick*.

15. Section 16 of the Clayton Act, 15 U.S.C. § 26, states in part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . . . .

plaintiffs and defendants. Therefore in a case where the pass-on theory is sought to be used offensively, the exception could be stated as the situation where a seller owns or controls its customer, who then sells directly to plaintiff. The cases cited by the Supreme Court regarding the ownership or control exception in fact involve precisely such a situation. *See Perkins v. Standard Oil Co.,* 395 U.S. 642, 647–48, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969) (parent-subsidiary relationship between seller and direct purchaser); *In re Western Liquid Asphalt Cases,* 487 F.2d 191, 198, 199 (9 Cir. 1973), *cert. denied sub nom. Standard Oil Co. v. Alaska,* 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974) (seller controlled direct purchaser by financial arrangements).

Although the Supreme Court acknowledged the existence of an "ownership or control" exception to the general bar to suit by indirect purchasers claiming price-fixing, it did not elaborate on the facts necessary to satisfy that exception. Plaintiff has not alleged any facts which would bring it within the "ownership" exception, and the Court does not address that exception here. Plaintiff argues strenuously that it does state facts sufficient to come within the "control" prong of this exception at least for purposes of the Motion to Dismiss.

Plaintiff alleges in several parts of its Second Amended Complaint that defendant is engaged in a vertical conspiracy with firms on the wholesale or distribution level. It argues in opposition to the Motion to Dismiss that the allegation of the existence of this conspiracy is sufficient to raise the issue of defendant's control of the intermediate level in the chain of distribution, bringing plaintiff within the control exception.

The Court finds that it need not reach the question of whether a vertical conspiracy might in some cases constitute sufficient control to satisfy this exception, because whatever the resolution of this issue, the exception cannot be applied in the instant case.[16] The Court follows the reasoning of the Fifth Circuit:

> Whatever the merits of the arguments for [an exception for suits alleging vertical conspiracy] in general, we do not think that the reasoning of *Illinois Brick* permits recognizing the exception when, as here, the alleged co-conspirator middlemen are not named as parties defendant. Absent joinder of the [middlemen], the rule forbidding one antitrust conspirator from maintaining an action against another for damages arising from the joint activity would not protect these defendants from the risk of overlapping liability. The [defendants here] could not, in a suit brought by the [middlemen], use a judgment or finding of vertical conspiracy in the instant case to prevent the [middlemen] from successfully asserting in their own suit that they did not in fact conspire with the [defendants here] and are therefore not barred by the co-conspirator doctrine from recovering damages from the [defendants]. *E. g., Mosher Steel Corp. v. N.L.R.B.,* 5 Cir. 1978, 568 F.2d 436. Because the [middlemen] are not parties to this suit, the possibility of inconsistent adjudications on the issue of the existence of a vertical

16. One court has held that a vertical conspiracy constitutes sufficient control to warrant an exception to the *Illinois Brick* rule. *See Gas-A-Tron of Arizona v. American Oil Co.,* 1977–2 Trade Cas. ¶ 61,789 at 73,244, 73,245 (D.Ariz. 1977). *But see In re Anthracite Coal Antitrust Litigation,* 1978–1 Trade Cas. ¶ 62,059 (M.D.Pa. 1979) (allegation of conspiracy as exception to *Illinois Brick* too speculative a claim to support certification of class). *See generally* Note, "Scaling the *Illinois Brick* Wall: The Future of Indirect Purchasers in Antitrust Litigation," 63 Cornell L.Rev. 309, 328–329 and nn. 84, 85, 331 n. 96, 332 n. 98 (1978); "The Supreme Court, 1976 Term," 91 Harv.L.Rev. 70, 230 (1977).

Prior to the Supreme Court's decision in *Illinois Brick,* there was some case law to suggest the existence of such an exception. *See Donson Stores Inc. v. American Bakeries Co.,* 58 F.R.D. 481, 485 (S.D.N.Y.1973) (*dicta*). *See also In re Master Key Antitrust Litigation,* 1973–2 Trade Cas. ¶ 74,680 (D.Conn.1973), *reopened on 60(b) motion,* 76 F.R.D. 460 (D.Conn.1977), (control issue presents question of fact). The case cited by plaintiff in support of this proposition, *Florida Power Corp. v. Granlund,* 78 F.R.D. 441 (M.D.Fla.1978), is inapposite. Plaintiff in that case was a direct purchaser from the defendant, and *Illinois Brick* therefore presented no bar to its suit.

conspiracy leaves the defendants subject to the risk of multiple liability that the *Illinois Brick* court found unacceptable. *In re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1163 (5 Cir. 1979). *See also* Comment, "Scaling the *Illinois Brick* Wall: The Future of Indirect Purchasers in Antitrust Litigation," 63 Cornell L.Rev. 309, 332 n. 98 (1978).

Exceptions to the *Illinois Brick* rule, which precludes indirect purchasers from suing for overcharges, are limited to those circumstances where use of the pass-on theory to prove damages is rendered unnecessary because relationships between the parties are such that the amount passed on is readily ascertainable. In such circumstances

> [t]he effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.

*Illinois Brick,* 431 U.S. at 736, 97 S.Ct. at 2070. Although the existence of "middlemen" can be ignored in such cases for purposes of determining the overcharge paid by an indirect purchaser, these middlemen exist as potential plaintiffs in another suit against the alleged antitrust violator. The holding of *Hanover Shoe* would not necessarily prevent the alleged price-fixer from arguing, by analogy, that the middlemen passed on the overcharge to indirect purchasers under the terms of an illegal conspiracy, because any exception to the bar to use of the pass-on theory must be applied equally to plaintiffs and defendants. *See Illinois Brick,* 431 U.S. at 735, 737 n. 18, 97 S.Ct. 2061.

The problem lies rather in the fact that the issues of the existence and terms of a vertical conspiracy would be subject to inconsistent adjudication if all of the possible claimants are not parties to one suit. Collateral estoppel is not available in a subsequent suit unless the party against whom a

finding is sought to be used was a party to the prior proceeding. *See, e. g., Artrip v. Califano,* 569 F.2d 1298, 1300 (4 Cir. 1978). Plaintiff here has not sued any of the alleged co-conspirators. Therefore the reasoning of *Illinois Brick* precludes this Court from considering the vertical conspiracy issue on the merits.

Plaintiff also argues that it falls within the "pre-existing cost-plus contract" exception to *Illinois Brick.* The Supreme Court describes this exception in the following terms:

> In such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price.

*Illinois Brick,* 431 U.S. at 736, 97 S.Ct. at 2070. One element necessary to this exception is that the indirect purchaser be a party to a pre-existing cost-plus contract with its intermediaries. Plaintiff does not allege the existence of such a contract and the exception therefore has no application in this case. Further discovery is not necessary for the determination of this issue because the relevant information resides with the plaintiff, who has failed to make the necessary allegation.

Plaintiff's claims do not fall within the exceptions to the *Illinois Brick* rule outlined by the Supreme Court. Therefore plaintiff may not recover treble damages for overcharges passed on to it through the chain of distribution. The portion of plaintiff's Fourth Cause of Action seeking such relief must accordingly be dismissed.

### b. *Injunctive Relief*

Plaintiff argues that, even if it is barred from recovering treble damages for overcharges, it is still entitled to seek injunctive relief under Section 16 of the Clayton Act.[17] This Court agrees. Both

---

17. The Court notes initially that plaintiff's prayer regarding the Fourth Cause of Action does not include a request for injunctive relief directed toward defendant's alleged price-fixing

conduct. However, plaintiff does request "such other and further relief as may be just and proper" and F.R.Civ.P. 54(c) mandates that the court grant the relief to which a party is

the Third Circuit and the Fifth Circuit have considered this question and have reached the same conclusion. *In re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1167 (5 Cir. 1979); *Mid-West Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573, 594 (3 Cir. 1979). The Fifth Circuit explained:

> *Illinois Brick* does not bar suits for injunctive relief by indirect purchasers in price-fixing actions because the policy considerations underlying the pass-on rule are not implicated in claims for injunctive relief. An injunctive suit does not expose a defendant to monetary liability at all, much less to the risk of duplicative liability, and does not require the trier of fact to determine the incidence of the overcharge. To secure injunctive relief under section 16 of the Clayton Act, the plaintiffs need show only "threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. To show a threat of such injury, plaintiffs in a case such as this would not have to show the extent of their harm. It would suffice to show by a preponderance of the evidence that the alleged price-fixing had or will have some adverse impact on . . . prices . . [or] demand . . . .

*In re Beef Industry,* 600 F.2d at 1167.[18]

*Illinois Brick* thus presents no bar to injunctive relief on the price-fixing claim in this case. The Court notes that plaintiff here must still establish, as Section 16 requires, that principles of equity entitle it to such injunctive relief. *See Mid-West Paper,* 596 F.2d at 594. However, this issue is not yet ripe for determination, and the Court therefore expresses no opinion on the merits of this claim. The Court denies defendant's motion as to plaintiff's request for injunctive relief relating to its price-fixing claim.

entitled, even if the party has not demanded such relief. Therefore if plaintiff proves entitlement to an injunction, its failure to demand that relief will not preclude the Court from granting it.

## C. *Plaintiff's Fifth Cause of Action*

Plaintiff's Fifth Cause of Action (Agreement Not to Deal) states as follows:

16. Beginning in 1974, the exact date being unknown to plaintiff, and continuing up to and including the date of the filing of this Second Amended Complaint, the defendant together with certain co-conspirators has engaged in an unlawful contract, combination, and conspiracy in unreasonable restraint of intra- and interstate trade and commerce in violation of Sections 1 and 2 of the Sherman Act and Section 38(a)(1) of the Maryland Antitrust Act.

17. The aforesaid violation has occurred by virtue of the fact that defendant and its premium distributors have agreed that said premium distributors would refuse, and have carried out a joint course of conduct pursuant to which said premium distributors have refused to sell defendant's lines of merchandise to persons other than premium users, including plaintiff in violation of Sections 1 and 2 of the Sherman Act and Section 38(a)(1) of the Maryland Antitrust Act. As a result, plaintiff has been damaged.

Paper No. 56.

Defendant argues in its Motion to Dismiss that this claim is precluded under *Illinois Brick* because plaintiff, as indirect purchaser, cannot bring suit under Section 4 of the Clayton Act. The above-quoted paragraphs state a claim of injury by reason of group boycott or concerted refusal to deal in violation of the antitrust laws. Proof of such a claim does not involve proof of an overcharge by defendant or that the overcharge was passed on by intermediaries to the plaintiff. *Cf. Mid-West Paper,* 596 F.2d at 585 and n. 47. In fact, this claim requires proof that no dealing took place. Therefore, the Supreme Court's holding in *Illinois Brick* does not mandate dismissal of this cause of action. *See* discussion *supra.*

18. The Southern District of Ohio considered this question and reached a contrary conclusion. *Parkview Markets, Inc. v. Kroger Co.,* 1978–2 Trade Cas. ¶ 62,373 (S.D.Ohio 1978). However, this Court finds the reasoning of that case to be faulty and accordingly declines to follow its holding.

### D. *Plaintiff's State Claims*

Both the Fourth and Fifth Causes of Action alleged in plaintiff's Second Amended Complaint assert a right to recover under the Maryland Antitrust Act, Md. Com.Law Code Ann. § 11–201 *et seq.* (1975) (formerly Md.Ann.Code, art. 83, § 36 *et seq.* (1957)). This Act provides at § 11–202(a)(2):

> It is the intent of the General Assembly that, in construing this subtitle, the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters . . . .

This Court therefore holds that its decision on the Motion to Dismiss as to the federal claims disposes of the state claims as well.[19] The state claim in the Fifth Cause of Action survives in its entirety. The state claim in the Fourth Cause of Action is dismissed only to the extent that it seeks to recover treble damages for alleged price-fixing by the defendant.

### III

### *Motion to Compel*

Resolution of the Motion to Dismiss brings the Court to a consideration of the plaintiff's Motion to Compel Discovery as to Request to Produce No. 15. At a hearing held on April 9, 1974 counsel for defendant informed the Court that relevant documents exist, but also represented to the Court that the information contained therein would be extremely valuable to defendant's competitors. Defendant has been careful to keep such information confidential at all times.

One element in a claim brought under Section 2 of the Sherman Act is that the defendant possess monopoly power in the relevant market. *United States v. Grinnell,* 384 U.S. 563, 570, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The information sought in Request to Produce No. 15 is relevant to this element. The foregoing disposition of the defendant's Motion to Dismiss has not eliminated plaintiff's claim under the Sherman Act. As noted earlier, the information sought is also, in part, relevant to plaintiff's Robinson-Patman Act claims. *See* n. 4, *supra.* Therefore the discovery sought is proper.

The fact that material otherwise properly sought is "confidential" or that it constitutes a trade secret is not itself a bar to discovery. *See National Utility Service, Inc. v. Northwestern Steel & Wire Co.,* 426 F.2d 222, 227 (7 Cir. 1970); *Olympic Refining Co. v. Carter,* 332 F.2d 260, 265 (9 Cir.), *cert. denied,* 379 U.S. 900, 85 S.Ct. 186, 13 L.Ed.2d 175 (1964). The proper approach to a claim of confidentiality is to permit discovery otherwise proper but to enter an appropriate protective order under F.R. Civ.P. 26(c) in order to prevent improper disclosure. *See, e. g., Olympic Refining,* 332 F.2d at 265; *Struthers Scientific & Int'l Corp. v. General Foods Corp.,* 45 F.R.D. 375, 378 (S.D.Tex.1968). The parties appear to agree that such an order would be appropriate in this case, but clash violently regarding its scope. Defendant stated at one point that it would object to any form of order which would allow any such docu-

**19.** Plaintiff argues against this disposition to the extent that it results in dismissal of any state claim. It cites this Court to *California v. California & Hawaiian Sugar Co.,* 588 F.2d 1270 (9 Cir. 1978). In that case the Ninth Circuit reversed the district court's denial of plaintiff's motion for remand to the state court following removal to federal court by defendants. The court of appeals found the denial to be an abuse of discretion where removal was grounded on the incorrect assumption that the complaint stated federal as well as state antitrust claims. It is true that the court suggested in *dicta* that the California state courts should decide in the first instance whether to follow the Supreme Court's holding in *Illinois Brick.* However, this policy did not form the basis for the court's reversal. Furthermore, the plaintiffs had sued originally in state court. Finally, the Ninth Circuit had no cause to consider the effect of a statutory provision similar to the Maryland provision quoted above. The case does not aid in the determination in the instant case.

California recently enacted legislation which abrogates the *Illinois Brick* rule for state antitrust claims. Cal.Stats.1978, c. 536, § 1, at 1667. Maryland has no such statute and the above provision therefore governs this Court's determination of the state claims.

ments to be disclosed to counsel of record for plaintiff because one of the counsel is an employee of the plaintiff. Defendant subsequently softened this position, but has continued to object to the disclosure of the documents to plaintiff's officers or employees.

Defendant's objections are unwarranted. Any person permitted access to the materials under the terms of a protective order would, of course, be subject to this Court's contempt powers for any unauthorized use or disclosure of the data. It remains for the Court to determine the persons who should be permitted to have access to the materials and the terms of such access.

■ Plaintiff's proposed protective order limits access to counsel of record. A strict construction of the term "counsel" would be unrealistically restrictive and therefore a loose interpretation, for example, one which included support staff and retained experts, might result. The Court feels that more control is afforded by an order which particularizes the persons who will have access to the material. Therefore the Court grants plaintiff's Motion to Compel and also issues the attached protective order. This order specifies the persons to be afforded access and the terms of such access. The terms set forth in this order address the concerns raised by defendant in its suggestions for a protective order, although this order takes a different approach to the resolution of these concerns than that proposed by defendant.

■ The Court notes finally that plaintiff has moved to have the instant request be deemed to cover material brought into existence up to the present time. Discovery as to materials produced after the filing of the complaint is proper where the materials are relevant to plaintiff's claims. *See United States v. I.B.M. Corp.,* 66 F.R.D. 180, 184–5 (S.D.N.Y.1974); *Carlson Cos. v. Sperry & Hutchinson Co.,* 374 F.Supp. 1080, 1100–1104 (D.Minn.1974); *Bass v. Gulf Oil Corp.,* 304 F.Supp. 1041, 1045–1047 (S.D. Miss.1959). Such appears to be the case here. Therefore, this motion will be granted as, to such material, subject to the same

protective order discussed above. However, the Court notes that this disposition is not meant to deprive defendant of any other objection it may have to such discovery.