Bessie M. BEASLEY

v.

**KROEHLER MANUFACTURING COMPANY.**

No. CA 3–74–114–C.

United States District Court,
N. D. Texas,
Dallas Division.

Jan. 21, 1976.

E. Brice Cunningham, Dallas, Tex., for plaintiff.

William L. Keller and Allen Butler, Clark, West, Keller, Sanders & Butler, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

This Title VII action was brought by the plaintiff, Bessie M. Beasley, a Negro female resident of Dallas, Texas, against the defendant, Kroehler Mfg. Co., in her individual capacity and as a representative of black employees working at the defendant's furniture plant located in Dallas, Texas. Plaintiff alleges that the defendant discriminated against her in several respects and against the class she seeks to represent with respect to terms and conditions of employment, promotions, wages and work assignments. Plaintiff filed charges with the Equal Employment Opportunity Commission on February 21, 1970, March 21, 1970 and September 30, 1970. On February 7, 1974, plaintiff filed a charge alleging that the defendant terminated her in re-

taliation for her having filed the 1970 charges. All charges were timely filed and the plaintiff filed her Complaint within 90 days after receipt of her Notice of Right to Sue on the 1970 charges. On February 21, 1975, plaintiff, with the Court's permission, filed an amended Complaint after receipt of a Notice of Right to Sue with respect to her retaliation charge. The Court finds that the jurisdictional prerequisites to the institution of this suit have been met, and that it has jurisdiction of the subject matter and the parties to this litigation.

*Plaintiff's Individual Claims:*

Plaintiff alleged in her various charges filed with the Equal Employment Opportunity Commission that she was denied an upholsterer's job pursuant to bid in October, 1970; that she did not receive an equitable distribution of work while employed as a cushion sewer in the defendant's department of fabric sewing; that she was harassed by the defendant's hanging artificial snakes from a skylight, and that she was terminated on or about February 5, 1974 in retaliation for having earlier filed charges of racial discrimination.

1. Plaintiff's claim that she was not awarded a job as an upholsterer in October, 1970, pursuant to bid, because of her race, is without merit. The evidence establishes that defendant advised plaintiff that her bid was denied because of her poor work as a cushion sewer.[1] Plaintiff grieved the denial through her Union,[2] with the result that one of defendant's industrial engineers and a Union industrial engineer came to the defendant's Dallas plant for the purpose of examining plaintiff's sewing machine, which plaintiff claimed did not operate properly, and for the further purpose of observing plaintiff's habits as a sewer. After studying plaintiff's ma-

---

1. Defendant's conclusion that plaintiff was not qualified was based on plaintiff's inability to earn at least the "basic rate" as a cushion sewer—a level of earnings which plaintiff never attained during three years in that job. The "basic rate" is discussed in a subsequent portion of this opinion.

2. Plaintiff and all of defendant's maintenance and production employees were represented by Local 236 of the Upholsterers' International Union of North America, A.F.L.–C.I.O.–C.L.C.

chine and observing her thoroughly, the engineers jointly concluded that the plaintiff's sewing machine operated properly and that the plaintiff was not a qualified sewer. In view of these findings, the Union did not appeal the grievance to impartial arbitration pursuant to the grievance procedure established in the defendant's collective bargaining agreement with the Union. Title VII does not compel an employer to promote an employee to a job that it, in good faith, believes the employee is incapable of performing. *Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The Court is of the opinion that the defendant rejected plaintiff's bid because of the poor quality of her work as a cushion sewer, and not because of her race.

■ 2. Plaintiff's claims of unfair work distribution in the cushion sewing department require some brief explanation of the defendant's method of compensating its employees. Most production employees, including cushion sewers, are compensated by the "Kroehler piecework system". Pursuant to it, employees earn the "job-time rate" ("JTR") for each piece-work operation performed by them. The time earned ("JTR") is then multiplied by a money factor—the "basic rate"—negotiated with the Union. The basic rate is defined in the contract with the Union as the amount of money per hour an average employee working at an average speed under normal conditions should earn. If the JTR has been properly established for each sewing operation performed by plaintiff and other cushion sewers, which is not disputed,

each such operation has the same earning potential. In addition, cushion sewers are entitled to receive "fabric allowances" for sewing certain hard-to-handle fabrics, such as naugahyde (plastic) and velvet. Largely because of the payment of these fabric allowances, some sewers speak of naugahyde and velvet as "good work" and prefer receiving those schedules.[3] Because of efficiencies achieved in sewing "large" schedules, some sewers also prefer them to "small" schedules. No attempt was made to ascertain what constitutes a "large" or a "small" schedule and, indeed, the differences between the two would probably vary in the mind of each sewer.[4]

Plaintiff and a number of her witnesses complained that the cushion sewing dispatcher, a Caucasian, assigned Caucasians most of the naugahyde, velvet and large schedules and that these favored Caucasian sewers therefore were able to earn more than black sewers. Even if this were true, and the Court does not believe that the unequal distribution of these schedules would have any significant effect on earnings, evidence introduced by the defendant established that black employees, and particularly the plaintiff, received as many, if not more, of the so-called preferred naugahyde, velvet and large schedules than the Caucasian employees. Differences in earnings among cushion sewers, the Court therefore finds, were the result of differences in sewers' skills and abilities and not the result of favoritism in the distribution of schedules by the cushion sewing dispatcher.[5] Title VII specifically provides that "it shall not be an unlaw-

---

3. A "schedule" is one or more pieces of fabric to be sewn into one or more cushions for stuffing.

4. The defendant recognized, however, that certain inefficiencies resulted when an employee was assigned small sewing schedules. Thus, it also paid a "small schedule allowance" to sewers assigned a schedule which should be completed in 1.2 hours or less—that is, a schedule of pieces with a total JTR of less than 1.2 hours.

5. Plaintiff and other cushion sewers were advised by the Union's president on a number of

occasions to file grievances challenging the JTR established by the defendant for piecework operations, if they were of the opinion that the assignment of particular sewing schedules affected their earning potential. No sewer, however, filed any such grievance, although defendant's collective bargaining agreement with the Union contains special provisions for investigation, review and revision of the JTR upon the filing of a grievance by any employee, and a finding that the grievance has merit.

ful employment practice for an employer to apply different standards of compensation . . . pursuant to a . . . system which measures earnings by quantity or quality of production . . . ." 42 U.S.C. § 2000e–2(h). Plaintiff and her witnesses did not have their earning potential affected by the assignment of preferred sewing schedules to Caucasian sewers.[6]

■ 3. Plaintiff next claims that defendant harassed her because of her race, by hanging artificial snakes from the ceiling of its plant. Before its plant was airconditioned, defendant, in the summer opened the skylight in the roof for better ventilation. The opened skylight allowed birds to enter the building, to the damage of some of the fabric used in the plant. One of the defendant's mechanics hit upon the idea of hanging artificial snakes from the ceiling to scare off the birds. His experiment proved to be successful with a result that artificial snakes were soon hanging throughout the defendant's plant. The idea was so successful, in fact, that the engineer received an award from the defendant for it and it was implemented in other of defendant's plants as well. The Court finds the plaintiff's claims that she was harassed by the hanging of an artificial snake in the cushion sewing department to be without merit.

■ 4. In February, 1973, the plaintiff bid on and was awarded a job as an upholsterer on one of the defendant's upholstering lines. Upholsterers are compensated · according to the Kroehler piece-work system. All upholsterers on an upholstering line are paid the same amount, based upon their joint produc-

tivity and no upholsterer on that line earns the JTR for his/her efforts until a finished piece of upholstered furniture comes off the line. Plaintiff was assigned to station number 9, the last station on an upholstering line. Since plaintiff's line was newly formed, its members were initially paid a training rate. The members of this line, including plaintiff, when initially interviewed for upholstering positions, were advised that if they did not attain the basic rate level of production after being trained, they would be terminated. From February, 1973 to February 5, 1974, the date of her termination, the plaintiff was given more than sufficient opportunity, training and assistance to become a qualified upholsterer.[7]

After the passage of some months, the employees were trained and considered to be qualified upholsterers and their wages were earned and paid in accordance with the defendant's piece-work system. In September, 1973, the line to which plaintiff was originally assigned, upholstering line 6, was disbanded and basically reconstituted as upholstering line 1, which made Sleep-or-Lounges. Plaintiff was assigned to station number 9 on this line, also. During the 21 weeks between September 26, 1973, the date defendant began compensating these line 1 employees in accordance with its piece-work system, and February 5, 1974, the date plaintiff was terminated, they earned less than the "basic rate" in all but four weeks. Low earnings led to numerous meetings between the line members and management, expressions of discontent by the employees and eventually to time studies of each member of the line by the plant engineer. A num-

6. Plaintiff alleged that the cushion sewing dispatcher, a Caucasian, and a member of the Union, once referred to another cushion sewer · as a "nigger lover". This statement was admittedly made by the dispatcher in anger. The defendant's personnel manager at the time reprimanded the dispatcher for making this statement and there is no evidence that any other statement of this type was made by the dispatcher on any other occasion. Furthermore, the evidence introduced by defendant, as discussed above, established that the dis-

patcher assigned the allegedly preferred work schedules to all cushion sewers on an equitable basis. There is, thus, no evidence before the Court to suggest that the dispatcher's attitude resulted in any unfair distribution of work to black employees or adversely affected their earnings or earning potential.

7. Plaintiff was also advised in writing on at least two occasions that she would be terminated if her productivity did not increase to at least the basic rate level.

ber of time studies made of the plaintiff, plus the visual observations of defendant's plant engineer led defendant to conclude that although she had been adequately trained, plaintiff was still not capable of performing at the basic rate level of production. Plaintiff, furthermore, was the only employee on the line who did not perform consistently at or above that level. This lack of skill on the part of the plaintiff affected not only her earnings, but those of all other line members as well. After counselling, training and written warnings and numerous meetings failed to increase plaintiff's productivity, the defendant's local management concluded on February 1, 1974 that it must terminate her due to her poor workmanship. This decision by local management was overruled by defendant's Vice President of Industrial Relations due to the pendency of plaintiff's charges filed with the EEOC. When several other employees, however, complained on February 4, 1974 about the plaintiff's work and threatened to resign, defendant's Vice President of Industrial Relations advised local management to take any action it deemed necessary. Local management, being of the opinion that the welfare of the plant, employee morale and plaintiff's own poor workmanship required plaintiff's discharge, terminated her on February 5, 1974.[8] In the Court's opinion, the defendant terminated plaintiff for the poor quality of her work and not in retaliation for her having filed charges with the Equal Employment Opportunity Commission some four years earlier. *Griggs v. Duke Power Company, supra.*

*Plaintiff's Class Claims:*

■ Plaintiff also purports to bring the instant action for class relief pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, alleging that the defendant discriminates against its black employees as a class with regard to promotion, work distribution, discipline, wages and terms and conditions of employment. Several witnesses, all current or former black employees of the defendant, testified to alleged acts of discrimination by defendant. A number of these witnesses complained of unfair distribution of work in the cushion sewing department, as did plaintiff; other of plaintiff's witnesses complained of unfair work distribution in the cover sewing department, although one of defendant's black employees was cover sewing dispatcher during all times relevant to this suit. Still other witnesses testified to instances where their bids for promotion to an upholstering line had not been accepted, either due to the defendant's claim that their attendance was poor or that the job had been awarded to senior Caucasian employees.[9] Two witnesses testified to discrimination with respect to discipline which was overturned by the representative of the president of the defendant at the third step of the grievance procedure.

Plaintiff did not file a motion to have her action certified as a class action prior to trial on the merits, nor did plaintiff introduce any testimony of alleged discrimination other than those acts testified to by plaintiff and her witnesses. Several of these witnesses who complained of the defendant's failure to award them jobs they had bid on, subsequently bid successfully on the same or other jobs. Except for two instances in which employees were disqualified for promotion to other jobs by reason of poor attendance, which they admitted, the bids of plaintiff's witnesses were not accepted either because more senior qualified Caucasians also bid on the jobs or because a more senior black employee was awarded the job.

---

**8.** On the date of plaintiff's termination, line 1's earnings were below the basic rate for the part of the day plaintiff was on the line and above the basic rate for the rest of the day, after plaintiff was removed from it. In five of the seven weeks immediately following plaintiff's termination, line 1 earned at or above the basic rate level of production.

**9.** Defendant's contract with the Union since the late 1940's permitted employees to carry their company seniority with them if they successfully bid from one department to another.

The Court concludes that the plaintiff may not maintain her suit as a class action due to her failure to pursue class representation diligently through the filing of a motion to certify her suit as a class action, *Herbst v. Able,* 45 F.R.D. 451 (S.D.N.Y.1968); *Glodgett et al. v. Betit,* 368 F.Supp. 211 (D.Vt.1973); *Walker et al. v. Columbia University,* 62 F.R.D. 63 (S.D.N.Y.1973), and further, because of the plaintiff's failure to introduce evidence of alleged discrimination other than with respect to herself and her witnesses. Since all of plaintiff's witnesses were current or former employees of the defendant, were available to testify, reside in the City of Dallas and testified only with respect to alleged instances of discrimination affecting them, there is no reason why they could not have been joined as parties plaintiff. The Court therefore finds that the alleged class is not so numerous as to make the joinder of all its members impracticable. Furthermore, the testimony elicited from plaintiff and her witnesses does not present the Court with common questions of law or fact binding them together into a cohesive class seeking relief from the pervasive effects of an all-encompassing policy of discrimination. The claims of plaintiff's witnesses, as well as the claims of the plaintiff, represent an aggregation of individual complaints arising, for example, from the failure of the witnesses to receive certain jobs either through application of principles of seniority or through disqualifications resulting from their own deficiencies as employees which they readily admitted to, temporary work assignments which resulted in no monetary loss and frequently monetary gain, or the administration of plant rules pertaining to attendance and punctuality, which were applied equally to all employees. The Court thus finds that the prerequisites of Rule 23(b) have not been established, that there are no common questions of law or fact affecting the alleged class and that plaintiff's suit may not be maintained as a class action. The Court further concludes that the evidence does not establish that the defendant in fact discriminated against any of plaintiff's witnesses as claimed by them. The class claims are therefore dismissed.

*Conclusion:*

Based upon the entire record developed in this case, the Court concludes that the plaintiff's individual claims of discrimination under 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981 are without merit and that judgment should be entered for the defendant with respect to those claims. The Court further concludes that plaintiff may not maintain her suit as a class action and the class claims are accordingly dismissed.

The foregoing memorandum constitutes the Court's findings and conclusions in this case, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.