# In re FOLDING CARTON ANTITRUST LITIGATION.

**This Document Relates to Charming Shoppes of Delaware, Inc., et al., Civil Action No. 76 C 1026.**

**MDL No. 250.**

United States District Court, N. D. Illinois, E. D.

Dec. 4, 1980.

Harvey S. Kronfeld, Paul C. Madden, Philadelphia, Pa., for plaintiffs.

John J. McHugh, Donald G. Kempf, Jr., Chicago, Ill., for defendants.

PRETRIAL ORDER NO. 80

MEMORANDUM AND ORDER

ROBSON and WILL, Senior District Judges.

In 1976, approximately eighty civil antitrust treble damage actions alleging a price–fixing conspiracy by sellers in the folding carton industry were consolidated in this Court by order of the Judicial Panel on Multidistrict Litigation. In July 1977, we certified a class consisting of "[a]ll persons in the United States (excluding defendants, their subsidiaries, affiliates, or agents), who purchased folding cartons from any of the defendants in these actions during the period from January 1, 1960 to December 31, 1974." That class definition was necessarily a denial of Charming plaintiffs'[1] original motion for certification of a class which would include direct purchasers from non–conspiring, non–defendant manufacturers of folding cartons. Now, two and one–half years later, Charming plaintiffs have again moved for an order certifying a class consisting of "all persons in the United States (excluding Defendants, their subsidiaries, affiliates, or agents), who purchased folding cartons from any manufacturers of folding cartons in the United States (excluding Defendants, their subsidiaries, affiliates, or agents), during the period from January 1, 1960 to December 31, 1974." For the reasons hereinafter stated, we deny the motion for class certification and dismiss the suits brought by Charming plaintiffs.

I. *Class Certification*

A. Rule 23(a)

Defendants apparently concede that Charming plaintiffs meet the numerosity, commonality, and typicality requirements of Rule 23(a)(1)–(3). They argue, however, that Charming plaintiffs will not provide adequate representation of the other class members.

Before certifying a class, the court must find that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). An evaluation of adequacy of representation involves two factors: whether there is a conflict between the interests of the named plaintiffs and the interests of other members of the class and whether the representative parties, through their attorneys, will vigorously prosecute the class claims. *Hernandez v. United Fire Insurance Co.*, 79 F.R.D. 419, 425 (N.D.Ill.1978).

1. Conflict of interest

Defendants do not allege, nor do we find, any antagonism between the interests of the Charming plaintiffs, who seek to be the class representatives, and those of the unnamed members of the class.

Although lack of interest and intervention in the litigation by other class members is a factor negative to class certification, it is not "determinative of the question

1. Charming Shoppes of Delaware, Inc.; Charming Shoppes of Woodbury, Inc.; Fashion Bug of Audobon, Inc.; Charming Shoppes of Trenton, Inc.; Fashion Bug of Scranton, Inc.; Fashion Bug of Steubenville, Inc.; and Gushner Brothers, Inc.

whether the plaintiffs are qualified to act in behalf of the absent members of the class." *Hohmann v. Packard Instrument Co.*, 399 F.2d 711, 714 (7th Cir. 1968). *See also Folding Cartons, Inc. v. American Can Co.*, 79 F.R.D. 698, 704 (N.D.Ill.1978); *J. W. T., Inc. v. Joseph E. Seagram & Sons, Inc.*, 63 F.R.D. 139, 142 n.8 (N.D.Ill.1974). The only relevance of that factor is to strengthen an inference from other evidence of a conflict that their interests are antagonistic. *See*, *e. q., Lupia v. Stella D'Oro Biscuit Co.*, 1974–1 Trade Cas. ¶ 75,046 at 96,688 (N.D. Ill.). The failure of any other members of the proposed class to join the Charming plaintiffs, which defendants cite, is not significant since no such conflict has been shown here.

### 2. Diligence of prosecution

a. The timeliness of the motion to certify. Defendants argue that the delay in filing the present motion to certify (more than four years after the start of the litigation and two and one–half years from this Court's denial of the Charming plaintiffs' first motion to certify) demonstrates that the Charming plaintiffs will not vigorously prosecute the class action.

Failure to timely move for certification of a class "bears strongly on the adequacy of representation that those class members might expect to receive." *East Texas Motor Freight v. Rodriquez*, 431 U.S. 395, 405, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453 (1977). Class certification has been denied on the basis of delays in seeking certification even if that was the sole indicia of inadequate representation and regardless of whether certification finally was sought before or after trial. *Peritz v. Liberty Loan Corp.*, 523 F.2d 349, 354 (7th Cir. 1975); *Beasley v. Kroehler Manufacturing Co.*, 406 F.Supp. 926 (N.D.Tex.1976); *Lyon v. State of Arizona*, 80 F.R.D. 665, 667 (D.Ariz.1978); *Flora v. Moore*, 78 F.R.D. 358, 361 (N.D.Miss. 1978); *Walker v. Columbia University*, 62 F.R.D. 63, 64 (S.D.N.Y.1973); *Herbst v. Able*, 45 F.R.D. 451, 453 (S.D.N.Y.1968).

Plaintiffs argue that untimeliness cannot justify denial of certification unless defendants can prove that they were prejudiced by the delay, *citing Muth v. Dechert, Price & Rhoads*, 70 F.R.D. 602, 606 (E.D.Pa.1976) and *Feder v. Harrington*, 52 F.R.D. 178, 181–82 (S.D.N.Y.1970). Those cases, however, were decided before *East Texas Motor Freight v. Rodriquez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), which did not require a showing of prejudice, and in light of the Supreme Court's holding in that case, cannot be considered controlling. Furthermore, in *Muth*, the opponents of the class certification were not arguing that the untimeliness was an indication of inadequacy of representation but that the failure to file the motion within the period prescribed by the local rule was per se sufficient ground for denial. In fact, the court in *Muth* distinguished the case before it from cases in which certification was not granted because the delay demonstrated an inability or unwillingness to adequately represent class members. *Muth v. Dechert, Price & Rhoads*, 70 F.R.D. at 606. In *Feder*, the court found that the plaintiff there was not dilatory because, although she moved for class certification late, during that delay she completed discovery and was ready for trial. *Feder v. Harrington*, 52 F.R.D. at 182. Charming plaintiffs cannot avail themselves of either of those mitigating circumstances.

On the authority of *East Texas Motor Freight v. Rodriquez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), and *Peritz v. Liberty Loan Corp.*, 523 F.2d 349 (7th Cir. 1975), we find that the Charming plaintiffs have been inadequate representatives of the class, and their motion to certify the class is denied on that basis. Although the motion to certify was timely when it was first made in 1977, that initial diligence cannot mask their apparent disinterest for two and one–half years before the filing of the present motion after the denial of the original motion.[2]

---

**2.** Charming plaintiffs could have requested reconsideration from this Court, particularly since the original order did not address the

issues raised by Charming plaintiffs; they may have been able to appeal the denial under the collateral order exception to the final judgment

Charming plaintiffs do not attempt to justify the lengthy delay. *See Flora v. Moore*, 78 F.R.D. 358, 361 (N.D.Miss.1978). There has been no favorable change in the applicable law or facts to explain the sudden revival of Charming plaintiffs' interest in a class action. The economic analysis on which plaintiffs rely was available at least as early as July 1979 when the report of the economic expert was filed in support of the class action settlement. The delay actually was harmful since Charming plaintiffs did not request any discovery; it has now been closed, and certain facts pertinent to identifying class members and the non–defendant manufacturers and to proving damages may now be more difficult to procure.

b. Miscellaneous. The personal characteristics of the representative, the skill of the attorney for the named plaintiffs, and the financial commitment of the representatives, *see Hochschuler v. G. D. Searle & Co.*, 82 F.R.D. 339, 348 n.15 (N.D.Ill.1978), are also examined to determine the probable diligence with which the representatives will pursue the class action. No grounds for challenging the integrity of the Charming plaintiffs, the adequacy of their counsel, nor their financial capacity are present.[3]

### B. Rule 23(b)(3)

Although our finding that Charming plaintiffs do not meet the requirement of Rule 23(a)(4) necessitates the denial of their motion for class certification, we shall discuss as well the requirements of certification under Rule 23(b)(3).

### 1. Predominance

To certify a class under 23(b)(3), the court must find "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members ...." The predominant legal and factual questions in antitrust litigation are the existence of a conspiracy in violation of the antitrust laws and the fact of damages (impact). In our order certifying the class of direct purchasers from defendants, we found that the questions of conspiracy and impact were common questions. *In re Folding Carton Antitrust Litigation*, 75 F.R.D. 727, 734 (N.D.Ill. 1977). Defendants argue, however, that the question of impact on the Charming class members is an individual one since the Charming plaintiffs did not purchase folding cartons from defendants but from hundreds of other manufacturers whose sales practices and prices will not be before the Court.

The question of impact is a common question if it is susceptible to generalized proof. Proof on a common basis and a finding of predominance are appropriate if plaintiffs make a threshold showing of a nationwide conspiracy which has resulted in an increase in prices beyond the price which would have been charged in a competitive regime. *Alabama v. Blue Bird Body Co.*, 573 F.2d 309 (5th Cir. 1978); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *In re Master Key Antitrust Litigation*, 528 F.2d 5 (2d Cir. 1975); *Illinois v. Harper & Row Publishers, Inc.*, 301 F.Supp. 484 (N.D.Ill.1969); *In re Corrugated Container Antitrust Litigation*, 80 F.R.D. 244 (S.D.Tex.1978); *Technical Learning Collective, Inc. v. Daimler–Benz Aktiengesellschaft, Inc.*, 1980–1 Trade Cas. ¶ 63,006 (D.Md.1979); *In re Sugar Industry Antitrust Litigation*, 1977–1 Trade Cas. ¶ 61,373 (N.D.Cal.1976). Whether or not proof of impact can be generalized depends on the nature of the market and industry.

rule, *see Anschul v. Sitmar Cruises, Inc.*, 544 F.2d 1364 (7th Cir.), *cert. denied*, 429 U.S. 907, 97 S.Ct. 272, 50 L.Ed.2d 189 (1976); or they could have objected to the class settlement on the ground that the certified class was not sufficiently broad.

**3.** *Cf. Folding Cartons, Inc. v. American Can Co.*, 79 F.R.D. 698, 703–04 (N.D.Ill.1978) (class certification denied where representative had participated in deliberately deceptive selling schemes as a competitor of possible class members, where the individual who was the principle of the representative had sold substandard material and had deliberately lied, and where there had been extensive contacts and business negotiations between the representative and certain defendants).

**216**

*Alabama v. Blue Bird Body Co.*, 573 F.2d at 328.

The indication of the type of proof plaintiffs intend to use, together with our previous holding that the nature of the folding carton industry does not preclude generalized proof of impact, support a finding that, despite the numerous non–defendant sellers involved, the question of impact is a common question. The affidavit of plaintiffs' expert, Albert Mandansky, was based on his analysis of Performance Reports of the Paperboard Packaging Council. Mr. Mandansky states:

> [I]t is my opinion that the independent companies' folding carton prices, per ton, were consistent or in line with the conspiratorial prices, per ton, of the defendant integrated companies during the period of the conspiracy and were higher than the competitive market price for folding cartons in the United States during that period.

A second affiant, Sam Peltzman, stated that, under the circumstances of the case, it was his conclusion "that a finding that the firms outside the conspiracy sold at prices consistent with those of the firms within the conspiracy is entirely congruent with the expectation of economic theory." Although the plaintiffs may not be successful in proving this, the assertions in the affidavits are sufficient to qualify the Charming plaintiffs for class certification if the other requirements are met. *See In re Corrugated Container Antitrust Litigation*, 80 F.R.D. 244, 251 (S.D.Tex.1978) (court relied on affiant's statements similar to those submitted in this case to conclude that proof of impact could be generalized). Furthermore, even if the non–defendant manufacturers had different prices and sales practices, the proof with respect to the defendants' establishment of an umbrella price under which these variations occurred would be common to the class since the structure of the folding carton industry is not so inherently diverse as to require highly individualized, non–uniform negotiations. *See Hedges Enterprises Inc. v. Continental Group*, 81 F.R.D. 461, 475 (E.D.Pa.1979).

2. Manageability

■ In making the necessary finding under Rule 23(b)(3) "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy," the court must consider "the difficulties likely to be encountered in the management of a class action." Fed.R. Civ.P. 23(b)(3)(D). Manageability, however, is only one of the factors to be weighed in determining which method is superior; even if management may be difficult, "[m]anageability problems are significant only if they create a situation that is less fair and efficient than other available techniques." *In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322, 358 (E.D.Pa.1976). Because Rule 23 gives the court flexibility in the handling of class action, if management problems are only speculative and not evident in problems already experienced in the litigation, the class should be certified. *Id.* at 356. In fact, "[d]ismissal for management reasons, in view of the public interest involved in class actions, should be the exception rather than the rule." Manual for Complex Litigation, at 39 n. 72.

■ The factors pertinent to a manageability determination are the possibility of identifying and notifying class members and the difficulty of distributing damages. Defendants argue that, because discovery is closed and the non–defendant manufacturers will not be before the Court, the identities of class members cannot be determined. Charming plaintiffs, however, claim that class members can be identified with reasonable effort and without prohibitive expense from various paperboard packaging manufacturers' trade associations and mailing lists. The class mailing list from the previously certified class action can be used to exclude those purchasers who bought from the defendants and whose claims were extinguished by the class settlement. Use of similar types of trade association compilations has been approved as a means of solving the manageability problems involved in identifying class members. *See, e. g., In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322, 359 (E.D.Pa.1976). Al-

though the number of class members is large (approximately 100,000), that in itself does not make the class unmanageable or the cost of notice prohibitive, as long as plaintiffs are willing to bear the cost. *Cf. Eisen v. Carlisle & Jacqueline,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (certification of a class of 3,750,000).

The second factor in the manageability determination is whether there is a standardized method for proving damages. *Technical Learning Collective, Inc. v. Daimler–Benz Aktiengesellschaft, Inc.,* 1980–1 Trade Cas. ¶ 63,006 at 77,031 (D.Md.1979); *Windham v. American Brands, Inc.,* 565 F.2d 59, 68 (4th Cir. 1977), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). Class certification was denied in *American Brands,* an antitrust action against tobacco companies for allegedly fixing prices at auctions of flue–cured tobacco in South Carolina. The court found that proof of damages would be too complex because of the variety of claims, transactions, parties, and markets involved. 565 F.2d at 67. In *Philadelphia v. American Oil Co.,* 53 F.R.D. 45 (D.N.J.1971), the court denied certification of a class of motorists in Philadelphia and New Jersey who purchased gasoline from retail dealers at pump prices. That class would be unmanageable, according to the court, because, although it may have been easy to establish damages on a class level, class members would not have the records needed to distribute the damage amount to the rightful recipients. 53 F.R.D. at 72.

In view of the rarity of a truly unmanageable case, the management difficulties that would be involved if the Charming plaintiffs were certified do not justify denial of certification. The case, although complicated, does not involve a non–standardized, non–fungible, seasonal commodity sold at auction with extensive price fluctuations from market to market, from day to day, and from government grade to government grade as in *American Brands.* 565 F.2d at 62–63. Also, unlike *American Brands,* all members of this class are suing under the same theory of recovery. 565 F.2d at 67. Because the transactions at issue here are business purchases which are more likely to be documented than consumer sales, the problems of proof involved in *Philadelphia v. American Oil Co.* are also absent. Even if the determination of damages must be made eventually on an individual basis, reference to a master or magistrate may solve the management problems. *See In re Corrugated Container Antitrust Litigation,* 80 F.R.D 244, 253 (S.D.Tex.1978).

## II.   Standing

■ Complexity is not usually an appropriate ground for refusing to certify a class. Thus, the complexity of the Charming plaintiffs' class claim does not preclude a finding that the question of impact is predominant and capable of generalized proof or that the action is manageable. However, *Illinois Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), dictates that complexity be considered in terms of the plaintiffs' standing to bring the suit.

Rather than open the floodgates and extend section 4 of the Clayton Antitrust Act to its literal and seemingly limitless terms–protecting "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws,"–"courts have impressed a standing doctrine so as to confine the availability of section 4 relief only to those individuals whose protection is the fundamental purpose of the antitrust law." *In re Multidistrict Vehicle Air Pollution,* 481 F.2d 122, 125 (9th Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).[4]

---

4.   Neither party thoroughly briefed the question of the relevance of *Illinois Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), to the Charming plaintiffs' suit. The defendants saw "no need to distract the Court and parties at this time with a debate on plaintiff's standing." Since plaintiffs considered it a question on the merits of their suit, plaintiffs said the "effect, if any, of *Illinois Brick Co. v. Illinois, supra,* on this action need not and indeed should not now be decided . . . ." The defendants are correct, however, in characterizing the question as one of standing. As such, the impact of *Illinois Brick* must be addressed at this point in the litigation.

The Charming plaintiffs probably meet the traditional standing test. The target area test gives standing to any person within an area of the economy which defendants did foresee or reasonably could have foreseen would be endangered by the breakdown of competitive conditions.[5] *Illinois v. Ampress Brick Co.*, 536 F.2d 1163, 1167 (7th Cir. 1976), *rev'd sub nom. Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Cases have held that direct purchasers from non–conspiring, non–defendants are within the target area of defendants' conspiracy and, therefore, have standing to sue. *Mid–West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 597 (3d Cir. 1979) (Higginbotham, J., dissenting); *Illinois v. Ampress Brick Co.*, 67 F.R.D. 461, 468 (N.D.Ill.1975), *rev'd sub nom. on other grounds, Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Wall Products Co. v. National Gypsum Co.*, 357 F.Supp. 832, 840 (N.D.Cal.1973); *State of Washington v. American Pipe & Construction Co.*, 280 F.Supp. 802, 807 (W.D.Wash.), *cert. denied*, 393 U.S. 842, 89 S.Ct. 122, 21 L.Ed.2d 113 (1968).

■ However, the Supreme Court's decision in *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), if it did not completely reject the target area test, established that being in a target area was not sufficient to confer standing if factors deleterious to the effective administration of the antitrust laws were also present. In *Illinois Brick*, the Supreme Court held that indirect purchasers from price–fixing conspirators could not sue to recover the rise in price which was attributable to the antitrust violation and had been passed on to them by the direct purchasers, their sellers. This holding was an extension of *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), which had rejected the defensive use of the pass–on theory. The rationale for both *Illinois Brick* and *United Shoe* was that the "massive evidence and complicated theories," 392 U.S. at 493, 88 S.Ct. at 2231, involved in permitting the use of pass–on theories under section 4 "would add whole new dimensions of complexity to treble–damages suits and seriously undermine their effectiveness." 431 U.S. at 737, 97 S.Ct. at 2070. Complexity was considered important in *Illinois Brick* not only because of the burden it would impose on the courts and litigants but because the attendant costs and uncertainties would reduce the incentive to sue. 431 U.S. at 745, 97 S.Ct. at 2074.

Some concerns which supported the Supreme Court's decision in *Illinois Brick* are absent from a case involving direct purchasers from non–defendant suppliers as plaintiffs. In *Illinois Brick*, the Supreme Court did not want to impose on the defendants double liability–liability to both the direct and indirect purchasers–for, in effect, one illegal price rise. 431 U.S. at 730, 97 S.Ct. at 2066. Since the plaintiffs in this case are direct purchasers, duplicative recovery is not a possibility. *Mid–West Paper Products Co. v. Continental Group*, 596 F.2d at 597 (Higginbotham, J., dissenting). Another factor which weighed against conferring standing in *Illinois Brick* was that allowing indirect purchasers to recover would result in dividing the potential recovery among a much larger group (everyone in the distribution chain), thereby reducing the amount of damages any one plaintiff would recover and reducing the incentive to sue. 431 U.S. at 746, 97 S.Ct. at 2074.[6] Since only one

---

**5.** Another formulation of the standing requirement of section 4 is the direct injury or proximate cause test. The Seventh Circuit's definition of the target area test seems to partially incorporate the proximate cause test by including the concept of reasonably foreseeable injuries. For a discussion of standing in antitrust cases before *Illinois Brick, see In re Multidistrict Vehicle Air Pollution*, 481 F.2d 122, 125–57 (9th Cir.), *cert. denied*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

**6.** The Supreme Court's concern over double liability seems to be in conflict with its concern over apportionment. Double liability would occur if a defendant supplier illegally increased its prices by Y and its direct purchaser passed that increase on to the indirect purchaser; the *Illinois Brick* decision seems to contemplate that if the indirect purchaser had standing, the

level of distribution is involved in Charming plaintiffs' case, problems with apportionment are not present. Furthermore, *Illinois Brick* recognized that its holding that indirect purchasers may not sue could mean that violators would go unpunished since direct purchasers might not sue for fear of interrupting their source of supply. 431 U.S. at 746, 2074. Denying standing to Charming plaintiffs compounds that defect in *Illinois Brick* by eliminating "a particularly good enforcing class, purchasers from nonconspirators, who unlike the defendants' customers need not fear a disruption in their supply in retaliation for bringing suit." Note, *Standing of Purchasers from Nonconspirators to Challenge Price–fixing Conspiracy: Midwest Paper Products v. Continental Group, Inc.*, 93 Harv.L.Rev. 598,·604 (1980). Although that argument gave the Supreme Court pause in *Illinois Brick*, the Court finally rejected it since "on balance" the effectiveness of the antitrust laws was best served by eliminating the burden of litigating the intricacies of pass–on. 431 U.S. at 746, 97 S.Ct. at 2074.

Since the primary concern of the Supreme Court in *Illinois Brick* was with the complexity of proof, the most convincing distinction between *Illinois Brick* and Charming plaintiffs' case would be that proving Charming plaintiffs' case would be less burdensome than proving a pass–on case. Judge Higginbotham argued in his dissent in *Mid–West Paper Co. v. Continental Group*, 596 F.2d 573, 595–99 (3d Cir. 1979), that litigation of the claims of direct purchasers from non–defendant suppliers would not be significantly more complex than the typical case of direct purchasers suing their own suppliers. 596 F.2d at 599. Absent from cases such as that of the Charming plaintiffs is the necessity of apportioning damages among classes of plaintiffs by using the complex procedural devices which worried the Supreme Court in *Illinois Brick*. Furthermore, because only a

single distribution level is involved, a court would not have to trace effects of a conspiracy through several levels or to "determine the relevant elasticities of supply and demand at each level, and in many cases to evaluate the impact of the conspiracy on a product that is being processed or transformed." 93 Harv.L.Rev. at 603.

Although the identical complicating factors that were a concern in *Illinois Brick* may not be present in this case, the claims of direct purchasers from non–conspiring suppliers involve their own unique problems of determining the effect of the violation. In *Mid–West Paper Products*, the Court of Appeals for the Third Circuit outlined the difficulties it foresaw if standing were granted to purchasers in the Charming plaintiffs' position:

As noted in *Hanover Shoe*, "[a] wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different . . ., he would have chosen a different price." [392 U.S. at 492–93, 88 S.Ct. at 2231] Insofar as cost of production is an element in arriving at a price, each manufacturer operates at a different level of efficiency and sustains at least slightly varying expenses, thereby incurring different costs in creating the finished product. And in addition to actual cost, pricing decisions are based on various other considerations, such as marketing strategy and elasticity of demand. Although in selecting a price for its product a manufacturer must also take into account the market price for comparable items, to some extent its pricing decisions remain unaffected by the prices charged by others. This is so because of entry and exit conditions in the industry, the degree of interchangeability among the products, and time lags in adjusting to changes in

direct purchasers could recover 3 × Y from the defendants, and then the indirect purchasers could also sue for 3 × Y. The Supreme Court concern about apportionment, however, apparently focused on the difficulties of dividing 3 ×

Y between the direct purchasers and the indirect purchasers and anyone else who may have absorbed some of the illegal raise. If there was apportionment in that manner, there would be no double liability.

output, price and demand in the market, to name just a few factors.

596 F.2d at 584. *See also Liang v. Hunt*, 477 F.Supp. 891, 897 (N.D.Ill.1979); *Reading Industries, Inc. v. Kennecott Copper Corp.*, 477 F.Supp. 1150, 1161 (S.D.N.Y. 1979).

The proof in a suit by direct purchasers from non–conspiring sellers may be more complex than that in *Illinois Brick*. In the pass–on situation in *Illinois Brick*, if the conspirator raised his price by Y and a direct purchaser from the conspirator raised his price by Y (or some factor of Y), the cause and effect is simple: the indirect purchaser was charged more because the direct purchaser's costs went up. In Charming plaintiffs' case, the non–defendant suppliers' costs are not raised by his conspiring competitors' price hike; the effect of the price fixing is felt, if at all, through complex market forces.

The affidavit of the plaintiffs' expert illustrates how complicated their proof would be. His conclusion that the prices plaintiffs paid were affected by the defendants' conspiracy was reached after an examination of the difference between the percentages of the independent (presumably the non–defendants) and integrated (presumably the defendants) companies' costs and net profits as a percent of sales. Eleven separate costs were studied. The proof includes speculation about why cost to sales percents were different in two categories; the expert's opinion was that the defendants hid the effect of the conspiracy by an accounting transfer mechanism not available to the non–defendants because of the features of independent as opposed to integrated companies. Charming plaintiffs' case will be complicated, therefore, by examinations of the differences between integrated and independent companies, of the accounting procedures of the companies involved, and of the myriad factors which determine costs and prices.

In light of the Supreme Court's overriding concern with the burdensome proof in *Illinois Brick* and the similar complications in this case, we hold that the Charming plaintiffs do not have standing to sue the defendants from whom they did not purchase folding cartons for damages allegedly sustained on purchases from non–defendants.

Furthermore, we are reluctant to impose liability on the defendants when they gained no illegal benefit at the expense of the plaintiffs, since the plaintiffs did not purchase from them. "[The defendants'] tainted gains were reaped from those firms to which they actually sold their products, and [the plaintiffs'] added costs, if any, were pocketed by defendants' competitors, who presumably were free to charge a lower price if they so desired." *Mid–West Paper Products Co. v. Continental Group*, 596 F.2d at 583. Although defendants' price–fixing may have given non–conspiring sellers an opportunity to raise their prices while remaining relatively competitive, it also gave the non–conspiring sellers an opportunity to compete more effectively with the defendants by setting prices below the artificial umbrella raised by the defendants. The defendants should not have to answer in a suit for the actions of the non–defendant sellers in taking the former anticompetitive opportunity and eschewing the latter competitive one.

### III. Conclusions

For the reasons stated above, we find:

1. That the class of all persons who purchased folding cartons from any manufacturer except defendants is so numerous that joinder of all members is impracticable, Rule 23(a)(1); 2. that there are questions of law or fact common to the class, Rule 23(a)(2); 3. that the claims of the representative parties are typical of the claims or defenses of the class, Rule 23(a)(3); and 4. that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy, Rule 23(b)(3). However, we cannot find, as we are required to by Rule 23(a)(4), that the representative parties will fairly and adequately protect the interests

of the class. We, therefore, deny Charming Shoppes' motion to certify a class.

For the reasons stated above, we dismiss for lack of standing the suits of Charming plaintiffs.

An appropriate order will be entered.