**In re BRISTOL BAY, ALASKA, SALMON FISHERY ANTITRUST LITIGATION.**

**MDL Docket No. 249.**

United States District Court,
W. D. Washington.

Oct. 20, 1981.

Matthew D. Jamin, Alaska Legal Services Corp., Kodiak, Alaska, Matthew P. Mitchell, Feldman, Waldman & Kline, San Francisco, Cal., for plaintiff.

John J. McGrath, Jr., Donovan, Leisure, Newton & Irvine, Washington, D. C., Doug-

las M. Fryer, Moriarty, Mikkelborg, Broz, Wells & Fryer, Dexter A. Washburn, Schweppe, Doolittle, Krug, Tausend & Breezer, Seattle, Wash., for defendant.

SAMUEL CONTI, District Judge.

This is an antitrust action arising out of the Bristol Bay, Alaska, salmon fishery. The plaintiffs are a class of fishermen who sell raw salmon to the defendants, a number of seafood processing companies. Each side alleges that the other committed a number of antitrust violations in furtherance of a conspiracy to fix the prices at which the raw salmon would be sold to the processors. Such price-fixing is, of course, a per se violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

Some members of the plaintiff class[1] are fishermen who did not sell their fish exclusively to the defendants or to the defendants' alleged co-conspirators. Other plaintiffs did not deal with the defendants or alleged co-conspirators at all,[2] but sold fish only to other Bristol Bay processors. These fishermen are plaintiffs in the suit on the theory that the defendants are liable to them for having depressed fish prices throughout the market, thereby forcing the fishermen to sell their fish at unreasonably low prices to conspirators and nonconspirators alike.

The matter is now before the court on the motion of the defendants to dismiss, for lack of standing, "those portions of the complaints not based on sales of salmon to alleged conspirators." Defendants' position is that even if a conspiracy were to be proved, they cannot be held liable for plaintiffs' sales of fish to processors who had no connection with the conspiracy. Plaintiffs' argument is that defendants are liable for the direct consequences of their conspiracy even though the defendants themselves might not have participated in, or profited from, some of the transactions in which the plaintiffs were injured.

**I—The Nature of the Motion.**

■ As a procedural matter, if the defendants were to prevail on this motion it would be proper to dismiss, for lack of standing, those fishermen who sold no fish to conspirators. As to those fishermen who sold part of their catch to conspirators and part to non-conspirators, however, portions of their complaints would not be dismissed "for lack of standing," and the defendants are incorrect to style their motion in those terms. Standing is a concept which is applicable to parties, not to claims. Instead, the plaintiffs' claims, to the extent they exceed the scope of defendants' liability, would be dismissed for failure to state a claim upon which relief can be granted. Rule 12(b)(6), F.R.Civ.P. Although the following discussion is couched in terms of "standing" for purposes of convenience, the court will treat this motion as one under Rule 12(b)(6) to the extent that it involves claims rather than parties.

**II—Authority in Other Jurisdictions.**

■ The specific issue to be addressed, then, is whether conspirators who combine to fix prices and create a "price umbrella" affecting an entire market will be liable to plaintiffs who have dealt directly with non-conspirators, when the non-conspirators have altered their prices in response to the non-competitive situation created by the antitrust violations.[3] Neither the Supreme

---

1. The plaintiff class is defined as follows:

All commercial fishermen in the Bristol Bay salmon fishery who have participated in commercial salmon fishing in an entrepreneurial capacity in Bristol Bay during the 1971, 1972, 1973 or 1974 seasons, who are not past or present parties to the other three actions included in this litigation or past parties to this action, and who are shareholders of the Bristol Bay Native Corporation and residents of Alaska.

2. It will be assumed, for the purposes of argument, that the allegations of the plaintiffs will be proved to the jury. Therefore, the court will dispense with the term "alleged" in referring to the conspiracy and the conspirators.

3. It should be remembered that the plaintiffs will also be required to prove to the jury the existence of a "but for" causal relationship between the defendants' acts and the injury to them. The fact that the court grants them standing in no way lessens the plaintiffs' bur-

Court nor the Ninth Circuit has yet decided a case which presents that specific question, but other Federal Courts have done so. The result is that two conflicting rules have been propounded as to whether standing should be allowed in the instant situation.

In *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3rd Cir. 1979), the United States Court of Appeals for the Third Circuit adopted a rule that denies standing to plaintiffs so situated. Using a multi-faceted analysis, a majority of that panel decided that standing should be limited to those who have dealt directly with conspirators. Among the reasons for the decision to deny standing were: the defendants had gained no benefit from the transactions in question, and there was the possibility of ruinous liability if the defendants were held responsible to a greater degree. The court also cited the tenuous connection between the acts of the defendants and the injury to the plaintiffs, and the difficulty of the economic inquiry in ascertaining the actual damage the plaintiffs had suffered.

Other courts have followed the lead of *Mid-West Paper* and have adopted its reasoning and conclusions. E.g., *In re Petroleum Products Antitrust Litigation*, 497 F.Supp. 218 (C.D.Cal.1980), and *In re Folding Carton Antitrust Litigation*, 88 F.R.D. 211 (N.D.Ill.1980).

In a well-reasoned dissent, Judge Higginbotham disagreed with the majority in *Mid-West Paper* and came to a contrary conclusion as to the desirability of permitting plaintiffs to sue under the given circumstances. The Fifth Circuit came to that same conclusion in *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir. 1979), cert. denied, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980), albeit without any attempt at an in-depth analysis.

## III—*Illinois Brick.*

None of the foregoing decisions is binding upon this court. The reason that they merit attention here is that part of the dispute over the contradictory rules espoused in *Mid-West Paper* and *In re Beef Industry* is to what extent, if any, a denial of standing to plaintiffs who have dealt directly with non-conspirators is dictated by the United States Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1976). The three courts listed above which have denied standing have done so partly on the rationale that the inquiry in their cases was so similar to that in *Illinois Brick* that deference to the Supreme Court dictated their decision. And while there is indeed a superficial similarity in the two problems, it is this court's conclusion that the situation here and that presented in *Illinois Brick* are analytically distinct. *Illinois Brick* therefore provides no necessary indication as to the probable decision the Supreme Court would make were it to consider this particular issue.

In *Illinois Brick*, the court considered whether an indirect purchaser could offensively use a "pass-on" theory of liability against a seller who had fixed prices.[4] The court refused to allow the indirect purchaser standing to sue, citing primarily the complexity involved in calculating damages when a product has passed through several levels of distribution where a number of independent pricing decisions have been made. The court also noted the risk of multiple liability to the defendant because both direct and indirect purchasers might sue and recover for the same violation. Finally, the court's decision was seen as creating a desirable symmetry with the rule in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), where the court barred

den of establishing that it was the defendants' acts and not other market forces which occasioned the price structure that prevailed when the plaintiffs sold their fish.

4. There is no distinction, for the purposes of the present analysis, between a situation where

sellers conspire to raise prices and buyers conspire to lower them. Most of the reported cases involve the former situation while this one involves the latter; the standing inquiry is the same.

the defensive use of the "pass-on" theory and held that direct purchasers of over-priced products could recover for the full amount of the overcharge.

None of those considerations is present in the instant situation. Since the sales by the fishermen to conspirators and non-conspirators were all direct, the computation of damages is no more complex for one than for the other. There are no levels of distribution to be dealt with; the measure is simply the difference between the price which would have obtained in the presence of competition and that which actually prevailed under the pressure of the conspiracy.

There is no possibility of dual recovery in the instant situation. Only direct sellers will be granted standing to sue and they will recover only to the extent they can prove they were damaged. Finally, the fact that the transactions in this case are all direct ones obviates any need to fit the result into the *Hanover Shoe* rule, since that is concerned with indirect relationships and multiple transactions.

Of course, there are certain aspects of *Illinois Brick* that parallel this case: because both deal with the question of standing under § 4 of the Clayton Act, a number of the policy considerations are necessarily the same. Those policies—creating a vehicle for recovery by injured plaintiffs, limiting recovery to those for whom it is most appropriate, and providing that the damages obtained are not unreasonably large— are not violated by this decision. Rather, they are enhanced and followed. Plaintiffs who have been injured in their business or property will be given the opportunity to recover, and they will not recover to a greater extent than can be justly and accurately determined within the bounds of normal antitrust inquiries. See *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 552 (1946).

IV—The "Target Area" Test.

While the Ninth Circuit has not yet ruled on this particular issue, there is an established test for standing under § 4 of the Clayton Act in this Circuit. It is the "tar-get area" test, and it has been consistently applied in cases arising under § 4. *Contreras v. Grower Shipper Vegetable Ass'n of Central California*, 484 F.2d 1346 (9th Cir. 1973), cert. denied, 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1974); *In re Multidistrict Vehicle Air Pollution Case*, 481 F.2d 122 (9th Cir. 1973), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1974). District Courts in this Circuit have used the "target area" analysis in just the type of case presented here. *State of Washington v. American Pipe and Construction Co.*, 280 F.Supp. 802 (W.D.Wash.1968); *Bray v. Safeway Stores, Inc.*, 392 F.Supp. 851 (N.D. Cal.1975).

The target area within which a defendant is responsible for the effects of his antitrust violation is that area of the economy which is affected by the breakdown in competition. *Bray*, 392 F.Supp. at 862. Thus, the defendant's liability does not extend to every ripple that flows from his unlawful act. *Hawaii v. Standard Oil of California*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). Rather, it is limited to a specific market that the defendant has disrupted.

While the inquiry as to the bounds of that market might be difficult in some instances, it is quite simple in this case. The market is the salmon fishery in Bristol Bay, Alaska. The defendants and their co-conspirators are the major canners in the market and operating in concert would be the dominant force in it. Their plan, according to the plaintiffs, was to disrupt that market and create an artificial price structure throughout it. Such a scheme would be effective in damaging the plaintiffs because, historically, the vast majority of the fish caught in Bristol Bay have been processed locally. If the price there were controlled, the fishermen would be forced to accept that price since the geographic isolation of Bristol Bay would make it very difficult for them to find another outlet for their fish.

Thus, we are presented with a very specific target area that was the object of the

defendants' activities and within which the plaintiffs operated. The defendants are liable for the disruption of free market forces within that area and the plaintiffs have standing to sue them for their injuries within the market. The court is not aware that any of the plaintiffs sold fish to processors outside of Bristol Bay. To the extent, if any, that they did, they were outside of the target area for which the defendants are responsible and do not have standing to sue. If any plaintiffs are discovered to be in the latter situation, defendants may renew their motion as to them.

The defendants' motion is denied.