In re **URANIUM ANTITRUST LITIGATION.**

In re **TENNESSEE VALLEY AUTHORITY URANIUM ANTITRUST LITIGATION.**

No. MDL 342.
Master File No. 342–A.

United States District Court,
N.D. Illinois, E.D.

Sept. 24, 1982.

Charles W. Van Beke, Asst. Gen. Counsel, Tennessee Valley Authority, Knoxville, Tenn., for plaintiff.

Clarence O. Redman, Keck, Mahin & Cate, Chicago, Ill., for defendant.

## MEMORANDUM ORDER

PRENTICE H. MARSHALL, District Judge.

In this multidistrict litigation, plaintiff Tennessee Valley Authority ("TVA") seeks damages from defendants Gulf Oil Corporation and Gulf Minerals Canada, Ltd. ("Gulf") under § 1 of the Sherman Act, 15 U.S.C. § 1 (1976), which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade ...."[1] TVA alleges that Gulf was a member of an international uranium cartel which conspired to set the price of uranium at artificially high levels. Because TVA is a consumer of uranium, it has allegedly been forced to pay higher prices for uranium because of the existence of the cartel. TVA brings this action pursuant to § 4 of the Clayton Act, which permits "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" to sue for treble damages. 15 U.S.C. § 15 (1976).

TVA maintains that it was the victim of an unlawful boycott in which members of the cartel refused to bid at TVA's invitation on contracts for the sale of uranium to TVA at anything other than artificially high, cartel-set prices in November, 1973, forcing TVA to purchase its uranium through negotiated contracts, develop its own source of supply, and incur other substantial expenses, all of which it asserts are recoverable.

Gulf has moved for partial summary judgment, arguing that TVA's claims for damages caused by purchases at higher than competitive prices from nondefendants or entities not alleged to be members of the cartel are barred by the rule of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). In order to rule on the motion, we must first examine the holding in *Illinois Brick.*

*Illinois Brick* finds its roots in the decision of the Supreme Court in *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). There, the state of Hawaii sued under § 4 of the Clayton Act to recover damages to its general economy caused by antitrust violations. The Court held that the damages were not recoverable. The measure of damages in such a case would be impossibly speculative, posing insurmountable problems of proof. Moreover, allowing recovery would create an unacceptable risk of duplicative recoveries if both the state and individual antitrust plaintiffs were permitted to sue.

---

1. This litigation began on October 15, 1976, when Westinghouse Electric Corp. filed a complaint against twelve foreign and seventeen domestic corporations engaged in various aspects of the uranium industry, alleging the existence of an international cartel. TVA subsequently filed three separate lawsuits with allegations paralleling Westinghouse's in the Eastern District of Tennessee, the Southern District of New York, and the District of Colorado, which were consolidated with the Westinghouse case. Westinghouse has since settled its case, and TVA has settled all its claims save those made against Gulf in the Eastern District of Tennessee.

Five years later, the Court decided *Illinois Brick.* There the plaintiffs claimed that the antitrust defendants had charged higher than competitive prices to middlemen, who had passed on those cost increases to plaintiffs, who were the ultimate consumers. Relying on *Hawaii v. Standard Oil Co.,* the Court refused to permit such claims by indirect purchasers. The Court began by noting that, in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the Court had held those who sell goods at artificially high prices in violation of the antitrust laws cannot defend an action brought by a direct purchaser on the ground that the direct purchaser passed on the overcharge to its customers. The Court had rejected this defense first because it was unwilling to complicate suits under § 4 with the difficulties inherent in attempting to trace the effects of an overcharge on the purchaser's prices, sales, costs and profits, and second because it was unwilling to permit antitrust defendants to retain the fruits of their illegality since indirect purchasers might be less likely to sue for damages caused by overcharges. *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 724–25, 97 S.Ct. 2061, 2064, 52 L.Ed.2d 707 (1977). The Court then noted that consistency required that the Court either abandon *Hanover Shoe,* or permit antitrust defendants to use its rationale as a defense to suits brought by indirect purchasers, since the same difficulties are present whenever a "pass-on" theory is used, be it by the plaintiff or the defendant. *See* 431 U.S. at 729–37, 97 S.Ct. at 2066–70. The Court concluded that it would follow *Hanover Shoe* and not permit actions by indirect purchasers, in light of the risk of duplicative recovery created if both direct and indirect purchasers could sue, *see id.* at 737–41, 97 S.Ct. at 2070–72, and the difficulties of tracing overcharges through various levels in the distribution chain, *see id.* at 741–47, 97 S.Ct. at 2072–75.

Thus, *Illinois Brick* represents an attempt to avoid the type of antitrust claim likely to lead to unfair or unworkable results. Where there is no danger of those results, the rationale of *Illinois Brick* is plainly inapplicable. To evaluate claims in light of *Illinois Brick,* it is essential to examine the claim to determine whether it creates a risk of duplicative recovery or the problems associated with tracing the effects of an overcharge through the distribution chain. Where these dangers are not present, *Illinois Brick* does not operate as a bar to an antitrust claim. *See Blue Shield of Virginia v. McCready,* —— U.S. ——, 102 S.Ct. 2540, 2546, 73 L.Ed.2d 149 (1982); *In re Mid-Atlantic Toyota Antitrust Litigation,* 516 F.Supp. 1287 (D.Md.1981); *McCarty Farms, Inc. v. Burlington Northern, Inc.,* 91 F.R.D. 486, 490–91 (D.Mont.1981); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 494 F.Supp. 1246, 1255–56 (E.D.Pa.1980); *In re Folding Carton Antitrust Litigation,* 88 F.R.D. 211, 218 (N.D.Ill. 1980); *Dart Drug Corp. v. Corning Glass Works,* 480 F.Supp. 1091, 1101 (D.Md.1979); *In re Uranium Antitrust Litigation,* 473 F.Supp. 393, 403 (N.D.Ill.1979).

Gulf acknowledges that the actual holding of *Illinois Brick* is not applicable here, since TVA was a direct purchaser of uranium, and the problems associated with the status of indirect purchasers that the Court relied on in *Illinois Brick* are not applicable here. However, Gulf asserts that claims against nondefendants and nonmembers of the cartel pose the same difficulties that concerned the Court in *Illinois Brick,* and therefore should be barred under its rationale. In support of its position, Gulf relies on *Mid-West Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573 (3d Cir. 1979). There, the court held that an antitrust plaintiff may not recover overcharges from members of a cartel incurred when the plaintiff purchased goods from competitors of the cartel members. In *Mid-West,* the plaintiff argued that the defendant cartel members should be liable for the artificially high prices charged by their competitors, since the existence of the cartel created a "price umbrella" which enabled nonconspirators to charge artificially high prices. Judge Adams, writing for a divided

court,[2] concluded that this theory posed the same problems that were present in *Illinois Brick*. Specifically, he reasoned that it would be practically impossible to determine the effect of the cartel on the pricing policies of nonconspirators, given the wide variety of factors which influence pricing policies. *See* 596 F.2d at 584. Moreover, the court concluded that *Illinois Brick* represents a judgment that the objectives of the antitrust laws are fulfilled when the defendant is required to disgorge the fruits of its illegalities. Once that occurs, there is no need to go further and force antitrust defendants to pay for overcharges of others such as nonconspirators. *See id.* at 585–86. Finally, the court noted that permitting recovery for nonconspirators' overcharges creates a risk of ruinous recoveries, since it would create liability well in excess of the antitrust defendants' ill-gotten gains. *See id.* at 586–87.[3]

TVA's initial response to Gulf's *Illinois Brick/Mid-West Paper* argument is to claim that its complaint alleges an unlawful refusal to deal, rather than a simple case of price fixing. TVA goes on to argue that *Illinois Brick* applies only to price fixing cases, and not to boycott cases. Gulf joins the issue by arguing that this is not a boycott case,[4] and from there the parties proceed to engage in a semantic dispute over whether TVA's claims should be characterized as relating to a "boycott" or "price fixing."

2. Judge Higginbotham dissented.

3. For reasons that are unclear, Gulf also relies heavily on *Montreal Trading, Ltd. v. Amax, Inc.*, 661 F.2d 864 (10th Cir.1981), *cert. denied*, 455 U.S. 1001, 102 S.Ct. 1634, 71 L.Ed.2d 868 (1982), a case entirely irrelevant to the issue at hand. There, the plaintiff sought to recover overcharges although it had never actually purchased any noncompetitively priced items. The court noted that proof that the plaintiff would have purchased items but for the unlawful overcharge was necessarily speculative and created *Illinois Brick* problems. However, the situation here is much different, since TVA did purchase allegedly overpriced uranium. In any event, the entire discussion Gulf relies on is dictum; the holding of the case was that the complaint alleged insufficient contacts with the United States to justify federal jurisdiction over the claim.

In our judgment, the question of whether the complaint alleges a "boycott" or "price fixing" is entirely irrelevant to the issue at hand. *Illinois Brick* is not a case about semantics. It addresses intensely practical concerns associated with avoiding unfair or unworkable results in antitrust litigation. If the underlying policy concerns which motivated the result in *Illinois Brick* are applicable, then we believe *Illinois Brick* should be applied, regardless of the label that is attached to plaintiff's claims. *See Reading Industries v. Kennecott Copper Corp.*, 631 F.2d 10, 14 (2d Cir.1980), *cert. denied*, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981); *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1157–60 (5th Cir. 1979), *cert. denied*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980); *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 578, 582–83 (3d Cir.1979); *Callahan v. Scott Paper Co.*, 541 F.Supp. 550 (E.D.Pa.1982).[5]

 First, we turn to Gulf's claim that *Illinois Brick* precludes recovery for overcharges paid to cartel members not named as defendants. This claim is puzzling since Gulf seems to concede that it is liable for overcharges paid to its co-conspirators who are named as defendants. Indeed this is the case; nothing in *Illinois Brick* precludes liability for overcharges directly paid to members of a price-fixing conspiracy. *See,*

4. To the extent it matters, it appears that TVA is correct to argue that the complaint does allege a "boycott." The complaint alleges that cartel members refused to bid on TVA contracts unless TVA agreed to pay the cartel's prices. It has long been clear that a refusal to deal with the plaintiff unless he capitulates to the defendants' terms is a potentially unlawful boycott under the Sherman Act. *See, e.g., St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531, 543–45, 98 S.Ct. 2923, 2930–31, 57 L.Ed.2d 932 (1978). The fact that the plaintiff is not a competitor of the defendants is irrelevant. *Id.*

5. *See generally* Berger & Bernstein, *An Analytical Framework for Antitrust Standing*, 86 Yale L.J. 809 (1977). *See also In re Beef Industry Antitrust Litigation*, 542 F.Supp. 1122 (N.D. Tex.1982).

*e.g., Blue Shield of Virginia v. McCready,* —— U.S. ——, 102 S.Ct. 2540, 2546, 2550–51, 73 L.Ed.2d 149 (1982); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979); *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 729, 97 S.Ct. 2061, 2066, 52 L.Ed.2d 707 (1977); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 294 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *In re Sugar Industry Antitrust Litigation,* 579 F.2d 13 (3d Cir.1978); *Chatham Brass Co. v. Honeywell, Inc.,* 512 F.Supp. 108, 116 (S.D.N.Y.1981); *Go-Tane Service Stations, Inc. v. Ashland Oil Co.,* 508 F.Supp. 200 (N.D.Ill.1981); *In re Coordinated Pretrial Proceedings in Petroleum Antitrust Litigation,* 497 F.Supp. 218, 225–26 (C.D.Cal.1980); *Vermont International Petroleum Co. v. Amerada Hess Corp.,* 492 F.Supp. 429, 438–39 (N.D.N.Y.1980); *Reiter v. Sonotone Corp.,* 486 F.Supp. 115, 119–20 (D.Minn. 1980); *Dart Drug Co. v. Corning Glass Works,* 480 F.Supp. 1091, 1101 (D.Md.1979); *Hecht Co. v. Southern Union Co.,* 474 F.Supp. 1022, 1027–28 (D.N.M.1979); *Florida Power Corp. v. Granlund,* 78 F.R.D. 441, 443–44 (M.D.Fla.1978); *Gas-A-Tron of Arizona v. Shell Oil Co.,* 1977–2 Trade Cas. (CCH) ¶ 61,789 (D.Ariz.1977). Apparently, Gulf attaches some significance to whether the overcharge was paid to a cartel member who is not named as a defendant, arguing that *Illinois Brick* permits recovery for overcharges paid to conspiring defendants but not to conspiring nondefendants. However, Gulf never explains why anything should turn on this distinction, and cites no authority for the distinction. None of the policies underlying *Illinois Brick* are affected by whether or not the overcharge is paid to a named defendant or a non-defendant co-conspirator. To the contrary, it has long

been the law that an antitrust defendant is jointly and severally liable for the acts of its co-conspirators, *see e.g., In re Uranium Antitrust Litigation,* 617 F.2d 1248, 1257 (7th Cir.1980); *see also Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 554 (7th Cir.1980). Under this rule of law, Gulf is liable for any act of its co-conspirators in furtherance of the alleged price fixing conspiracy, whether or not that co-conspirator is named as a defendant. *See Ambook Enterprises v. Time, Inc.,* 612 F.2d 604, 620 (2d Cir.1979); *National Wrestling Alliance v. Myers,* 325 F.2d 768, 775 (8th Cir.1963); *Walker Distributing Co. v. Lucky Lager Brewing Co.,* 323 F.2d 1, 8 (9th Cir.1963); *Northwestern Oil Co. v. Socony-Vacuum Oil Co.,* 138 F.2d 967, 970 (7th Cir.1943), *cert. denied,* 321 U.S. 792, 64 S.Ct. 790, 88 L.Ed. 1081 (1944); *City of Atlanta v. Chattanooga Foundry & Pipeworks,* 127 F. 23, 25 (6th Cir.1903), *aff'd,* 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906); *Chatham Brass Co. v. Honeywell, Inc.,* 512 F.Supp. 108, 116 (S.D. N.Y.1981); *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 497 F.Supp. 218, 225–26 (C.D. Cal.1980); *Reiter v. Sonotone Corp.,* 486 F.Supp. 115, 119 n. 3 (D.Minn.1980); *Evanston Motor Co. v. Mid-Southern Toyota Distributors, Inc.,* 436 F.Supp. 1370, 1372 n. 1 (N.D.Ill.1977); *Wainwright v. Kraftco Corp.,* 58 F.R.D. 9, 11–12 (N.D.Ga.1973); *Washington v. American Pipe & Construction Co.,* 280 F.Supp. 802, 804–05 (W.D. Wash.1968); *Rohlfing v. Cat's Paw Rubber Co.,* 107 F.Supp. 549 (N.D.Ill.1952); *Martin v. Chandler,* 85 F.Supp. 131 (S.D.N.Y.1949). Gulf has cited no authority to the contrary.[6] We conclude that TVA may maintain its claims for overcharges paid to nondefendant co-conspirators.[7]

---

6. *Mid-West* contains nothing inconsistent with this conclusion. To the contrary, the court focused on the difficulties in determining what prices would have been charged in the absence of a cartel by those in competition with the cartel. Those problems are absent when the overcharges are paid to members of the cartel whose prices are set by the cartel.

7. We must confess, however, that Gulf's memoranda are sufficiently unclear so that we are

unsure whether Gulf has taken the position we have ascribed to it. In its motion for partial summary judgment, Gulf does not appear to seek dismissal of claims related to overcharges paid to nondefendant coconspirators. *See* Motion of Gulf Oil Corporation and Gulf Minerals Canada, Ltd. for Partial Summary Judgment (Seeking dismissal of "TVA's price-fixing claims as insufficient as a matter of law, except those based on purchases from a defendant or proven co-conspirator at prices affected by the

Second, we turn to TVA's claims involving overcharges paid to nondefendant nonconspirators. These are the types of claims that were addressed by the Third Circuit in *Mid-West Paper*. If we decide to follow *Mid-West* by concluding that the problems posed by attempting to prove that the prices charged by nonconspirators were inflated by the existence of the uranium cartel are insurmountable, then these claims are barred.

*Mid-West* has received considerable attention from both courts and commentators. A number of courts have found its reasoning persuasive. *See In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 497 F.Supp. 218, 227–28 (C.D.Cal.1980); *In re Folding Carton Antitrust Litigation*, 88 F.R.D. 211, 219–20 (N.D.Ill.1980); *Reading Industries, Inc. v. Kennecutt Copper Corp.*, 477 F.Supp. 1150, 1158, 1160–61 (S.D.N.Y.1979), *aff'd*, 631 F.2d 10 (2d Cir.1980), *cert. denied*, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981);[8] *Liang v. Hunt*, 477 F.Supp. 891, 896–97 (N.D.Ill.1979). However, *Mid-West* has not received universal acceptance; a number of

courts have rejected its reasoning. *See In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1166 n. 24 (5th Cir.1979), *cert. denied*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 187 (1980); *In re Bristol Bay, Alaska, Salmon Fisheries Antitrust Litigation*, 530 F.Supp. 36 (W.D.Wash.1981); *Strax v. Commodity Exchange, Inc.*, 524 F.Supp. 936, 939–40 (S.D.N.Y.1981); *Pollock v. Citrus Associates of the New York Cotton Exchange*, 512 F.Supp. 711, 718–19 (S.D.N.Y.1981); *Chatham Brass Co. v. Honeywell, Inc.*, 512 F.Supp. 108, 116 (S.D.N.Y.1981); *Illinois v. Ampress Brick Co.*, 67 F.R.D. 461, 468 (N.D.Ill.1975), *rev'd*, 536 F.2d 1163 (7th Cir.1976), *rev'd sub nom. Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Wall Products Co. v. National Gypsum Co.*, 357 F.Supp. 832, 846 (N.D.Cal.1973); *Washington v. American Pipe & Construction Co.*, 280 F.Supp. 802 (W.D.Wash.1968). *See also Mid-West Paper*, 596 F.2d at 595–599 (Higginbotham, J., dissenting in part).[9] In light of this split of authority, we must examine the question whether *Mid-West* is a sound interpretation of *Illinois Brick*.[10]

alleged conspiracy."). However, in its memorandum, Gulf appears to seek dismissal of claims involving payments to members of the alleged conspiracy solely because they are non-defendants. *See* Memorandum In Support of Motion of Gulf Oil Corporation and Gulf Minerals Canada, Ltd. for Partial Summary Judgment at 25 (Seeking dismissal of certain overcharge claims because they involve "suppliers [that] are not defendants.").

**8.** A careful reading of the Second Circuit's opinion in the *Kennecutt Copper* case reveals that the court did not adopt *Mid-West*'s blanket prohibition on recovery for overcharges paid to nonconspirators. Rather, the court of appeals' opinion rests on narrower grounds. In *Kennecutt Copper*, the defendants had conspired to keep the price they charged for domestically refined copper artificially low, in order to protect long-term sales. Since this scheme resulted in consumers of domestically refined copper saving money, plaintiff alleged that the scheme caused the price of copper scrap to increase, since consumers used their savings to "bid up" the price of scrap. Plaintiff never purchased any domestically refined copper from defendants, but sought recovery for alleged scrap overcharges paid to nonconspirators because of the cartel's pricing policy. The court of appeals did not embrace the district court's per se

rule against recovery for overcharges paid to nonconspirators. Rather, it held that the problem of tracing the effects of an undercharge between two separate markets were insurmountable. *See id.* at 13–14. Here, no similar problems exist, since no elaborate tracing between markets is required; the parties agree only one market is present here. *See Strax v. Commodity Exchange, Inc.*, 524 F.Supp. 936, 939–40 (S.D.N.Y.1981).

**9.** Commentators have also criticized *Mid-West*. *See* Page, *Antitrust Damages and Economic Efficiency: An Approach to Antitrust Injury*, 47 U.Chi.L.Rev. 467, 478–80 (1980); Case Comment, *Standing of Purchasers from Nonconspirators to Challenge Price-Fixing Conspiracy: Mid-West Paper Products Co. v. Continental Group, Inc.*, 93 Harv.L.Rev. 598 (1980). *But see* Note, *Monopolistic Price Fixing and Umbrella Pricing as a Theory of Antitrust Standing: A New View of Illinois Brick*, 50 U.Cinn.L. Rev. 52 (1981).

**10.** In this case, we sit as a United States District Court for the Eastern District of Tennessee, and are bound by the decisions of the Sixth Circuit. The only authority either party suggests is controlling in the Sixth Circuit on this question is *Malamud v. Sinclair Oil Corp.*, 521

As our earlier discussion of *Illinois Brick* indicates, a major theme underlying that opinion is the unacceptable risk of duplicative recovery created when both direct and indirect purchasers are permitted to sue under the antitrust laws. However, in this case, no risk of duplicative recovery exists. If TVA cannot recover for the overcharges it has paid nonconspirators, no one can. Far from eliminating a risk of duplicative recovery, a denial of standing in this case, assuming TVA can prove at trial that non-conspirators' prices were affected by the existence of the cartel, "would also result in the denial of compensation for injuries resulting from unlawful conduct." *Blue Shield of Virginia v. McCready,* —— U.S. ——, 102 S.Ct. 2540, 2546 n. 10, 73 L.Ed.2d 149 (1982).

In *Illinois Brick,* the court stated that by permitting a direct purchaser to recover the entire amount of overcharge, without any consideration of passing-on, the law ensures that defendants must pay for the full amount of damage they have caused, rather than permitting recovery to be depleted by litigation over pass-on issues. *See* 431 U.S. at 745–57, 97 S.Ct. at 2074–80. If standing is denied here, however, a serious gap in antitrust enforcement would be created, in that antitrust defendants would not be accountable for an entire category of damages they have caused.

> Denying standing to these plaintiffs leaves uncompensated an entire class of direct purchasers—the group *Illinois Brick* suggested would often be most harmed by the overcharges. Furthermore, the decision frustrates the congressional goal of deterrence by failing to hold the defendants accountable for a major portion of damages proximately caused by the conspiracy. *Illinois Brick* does not justify this result. The issue in that case was not whether the defendants should escape liability for a portion of the damages caused by the conspiracy, but rather, whether recovery should be apportioned among classes of plaintiffs.

Case Comment, *supra* note 9, at 604 (footnote omitted).[11]

In its most recent exposition in this area, the Supreme Court, in referring to *Illinois Brick* and *Hawaii v. Standard Oil,* stated,

> Both cases focused on the risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws.

*Blue Shield of Virginia v. McCready,* —— U.S. ——, 102 S.Ct. 2540, 2546, 73 L.Ed.2d 149 (1982). Here there is no such danger. In light of *McCready,* it is arguable that *Illinois Brick* should never be read to bar an antitrust recovery in the absence of a risk of duplicative recoveries. Whether or not *McCready* erects such a blanket prohibition, the fact that *Mid-West,* unlike *Illinois Brick,* creates a gap in antitrust enforcement is a strong argument against concluding that *Illinois Brick* justifies the rule of *Mid-West.*

Even if we assume that *Illinois Brick* could bar an antitrust claim in the absence of a risk of duplicative recoveries, we still find *Mid-West's* reasoning unpersuasive. *Mid-West* focused on the problems associated with proving what the prices of nonconspirators would have been but for the antitrust violation. However, this calculation,

---

F.2d 1142, 1149–50 (6th Cir.1975), in which the court adopted the "zone of interests" test for antitrust standing, according antitrust plaintiffs standing if they have suffered injury in fact and arguably fall within the zone of interests protected by the antitrust laws. TVA suggests *Malamud* is inconsistent with *Mid-West Paper.* However, *Mid-West Paper* addresses an entirely different problem than does *Malamud.* *Malamud* addresses the question of antitrust injury under § 4 of the Clayton Act. The problems addressed in *Illinois Brick* are "analytically distinct" from the standing questions addressed in

*Malamud.* *See* 431 U.S. at 728 n. 7, 97 S.Ct. at 2065 n. 7.

**11.** Moreover, *Illinois Brick* even manages to compensate indirect purchasers; they receive relief in the form of lower prices charged by direct purchasers as a result of their ability to sue in antitrust. *See* Landes & Posner, *Should Indirect Purchasers Have Standing To Sue Under the Antitrust Laws: An Economic Analysis of* Illinois Brick, 46 U.Chi.L.Rev. 602, 605–08 (1979).

whatever the difficulties it poses, is no more problematic than determining damages in any price-fixing case. In the most pedestrian price-fixing case, the trier of fact must calculate the price the defendants would have charged but for the conspiracy, in order to determine the measure of damages attributable to the conspiracy. *See, e.g.,* II P. Areeda & D. Turner, Antitrust Law ¶ 344a (1978). The difficulties of determining the "competitive price" that the seller would have charged in the absence of the conspiracy are not greater whether the price was charged by a conspirator or not.

In each case, the price actually charged is known. In each case, damages can only be assessed by determining what the market price would have been "but for" the price-fix. Of course in both cases, it is possible that the seller would have sold at a price above that of the market even without the price-fix and presumably the defendant would have an opportunity to present evidence of this.

*Mid-West,* 596 F.2d at 599 (Higginbotham, J., dissenting in part). *See also Bristol Bay Salmon Fisheries,* 530 F.Supp. at 39; *In re Mid-Atlantic Toyota Antitrust Litigation,* 516 F.Supp. 1287, 1295 (D.Md.1981); *Folding Carton,* 88 F.R.D. at 219. Once the "competitive" price of the nonconspirators is determined, it is not only logical but essential to infer that any price higher than that which the nonconspirators charged was the result of the cartel, since in a non-cartelized market, a seller can charge a higher than competitive price only at the risk of losing market share and profits. *See, e.g.,* R. Posner, Antitrust Law 44–47 (1976); L. Sullivan, Handbook of the Law of Antitrust § 110 at 318 (1977). In a cartelized market,

the price charged by nonconspirators will be a function of the price charged by conspirators; nonconspirators will either simply take the cartel's price as a given, or else act as oligopolists and reduce their output in order to enable the cartel to maintain its price structure.[12] In any event, the prices charged by the nonconspirators are the result of the existence of the cartel. *See* II P. Areeda & D. Turner, *supra* ¶ 337e; Page, *supra* note 9, at 479–80 & n. 60; Case Comment, *supra* note 9, at 605–06. *See also Wall Products Co. v. National Gypsum Co.,* 357 F.Supp. 832, 840 (N.D.Cal.1973).

We conclude that the *Mid-West* court's concern with the difficulties in proving whether the price charged by nonconspirators is attributable to the existence of the cartel is unwarranted. Determining the "competitive price" that would have been charged by nonconspirators absent the price fixing is no more difficult than making this calculation in the run-of-the-mill antitrust case. Once it is established that nonconspirators have charged more than competitive prices, the inference that the cost increase was caused by the cartel is inescapable. Granted there will be some uncertainty regarding these calculations, but no more so than in any price fixing case where it is uncertain what price the defendants would have charged but for the antitrust violation. Thus, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).[13]

The other concerns expressed by the court in *Mid-West* are more easily ad-

---

**12.** A model for economic behavior in such a market is provided in the appendix attached hereto.

**13.** Moreover, once it is established that TVA has been injured by Gulf's anticompetitive conduct, the amount of damage, *i.e.,* the difference between the price charged and the price that would have been charged but for the conduct, need not be established with absolute precision; it need only be reasonably estimated. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 339–42, 91 S.Ct. 795, 806–08, 28 L.Ed.2d 77 (1971); *Zenith Corp. v.*

*Hazeltine Research, Inc.,* 395 U.S. 100, 114–25, 89 S.Ct. 1562, 1571–77, 23 L.Ed.2d 129 (1969); *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562–66, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931). Gulf erroneously argues TVA may not recover damages for overcharges to be incurred in the future, under long term contracts. The above cases demonstrate that future damages may be recovered if they can be reasonably estimated.

dressed. The court adverted to the unfairness of requiring defendants to do more than simply disgorge their unlawful profits, and also have to pay for profits realized by nonconspirators. However, the antitrust laws do not seek only to force defendants to disgorge profits, but also to compensate plaintiffs for injuries proximately caused by defendants' antitrust violations, and nothing in *Illinois Brick* supports denying direct purchasers any portion of those damages which constitute compensation for the injuries to direct purchasers such as TVA proximately resulting from unlawful conduct. *See Blue Shield of Virginia v. McCready,* —— U.S. ——, 102 S.Ct. 2540, 2546 n. 10, 73 L.Ed.2d 149 (1982). Indeed, the existence of the treble damage remedy itself, as well as holding defendants liable for overcharges paid to co-conspirators, demonstrates that there is no congressional policy limiting antitrust damages to the amount of profit realized by an antitrust defendant as a result of its illegal activities. Finally, the antitrust laws seek to deter, *id.* and *Mid-West* results in underdeterrence, since it does not penalize defendants for the full amount of overcharge caused by their conduct; defendants will not internalize the full social costs of their actions.

The *Mid-West* court also noted that permitting liability for overcharges by nonconspirators would lead to potentially "ruinous" liability. However, the question of what amount of liability is "ruinous" is a classically legislative judgment. Congress,

in § 4 of the Clayton Act, has explicitly created an action for treble damages for any person "injured in his business or property by reason of anything forbidden in the antitrust laws . . . ." Once it is established that TVA has been injured because of the existence of the cartel, it is not for this court to ignore the plain language of the statute because it might create a "ruinous" liability. The answer to this concern is found in the Court's opinion in *Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), which was issued shortly after *Mid-West.* In *Reiter,* the Court held that consumers who paid artificially high prices for hearing aids could bring a class action to recover the overcharges under § 4. The Court wrote,

[R]espondents argue that the cost of defending consumer class actions will have a potentially ruinous effect on small business in particular and will ultimately be paid by consumers in any event. These are not unimportant policy considerations, but they are policy considerations more properly addressed to Congress than to this Court. However accurate respondents' arguments may prove to be—and they are not without substance—they cannot govern our reading of the plain language of § 4.

442 U.S. at 344–45, 99 S.Ct. at 2333–34.

We conclude that none of TVA's claims are barred by *Illinois Brick.*[14] Gulf's motion for partial summary judgment is denied.

14. In another of their frolic and detours, the parties engage in an elaborate argument as to whether the cartel's refusal to bid on TVA contracts is somehow protected by the actions of the Atomic Energy Commission ("AEC"), now the Nuclear Regulatory Commission. Beginning in 1964, the AEC had imposed a virtual embargo against the importation of uranium into the United States. In 1974, the AEC proposed a relaxation of the embargo, which would be phased in gradually, and become fully effective in 1984. Gulf argues that the reason members of the international cartel did not bid on TVA contracts was because the AEC embargo prohibited sales to TVA, rather than as part of a price-fixing scheme. If Gulf is arguing that the AEC's actions can provide it with some sort of exemption from the scrutiny of the antitrust laws, we have grave doubts about the correctness of its position. *See* 42 U.S.C. § 2135(a) (1976) (§ 105 of the Atomic Energy

Act, which provides that "Nothing contained in this chapter shall relieve any person from the operation of" the antitrust laws.). However, we do not understand Gulf to make this argument. *See* Supplemental Reply Brief of Gulf and GMCL in Support of Motion for Partial Summary Judgment at 1–2. Rather, it appears that Gulf is arguing that the cartel's conduct was not part of an anticompetitive scheme, but merely the inevitable result of the AEC's embargo. TVA, for its part, introduces material indicating that the refusal to bid on TVA's contracts was part of a scheme to have the embargo lifted and the domestic market penetrated by the cartel. Other material indicates that the cartel was willing to bid on domestic contracts despite the embargo, albeit at fixed prices. This evidence creates a classic issue of fact as to the purpose and effect of the cartel's actions with respect to TVA which can only be resolved at trial.

APPENDIX

---

At the competitive price P(c), the market supply curve MC(c) intersects the market demand curve D(m) at output Q(c). If firms agree to restrict output, they must take account of the output of nonconspiring firms (whose supply curve is given by MC(f)) that will enter the market at the higher prices. By subtracting these firms' output from the market demand at any given price, the cartel can construct the demand curve that it faces (AB) and the marginal revenue curve MR(c) drawn to AB. It may then set its profit-maximizing output where MC(c) intersects MR(c), yielding a price of P(1). At that price, the nonconspirators will expand output to Q(f), where MC(f) equals P(1). The total market output then is Q(f) + Q(1), or Q(m). The area X(1) represents the cost increase from the increased production of the less efficient nonconspirators; the area X(2) represents the welfare loss from the restriction of market output from Q(c) to Q(m).

SOURCE: Page, *Antitrust Damages and Economic Efficiency: An Approach to Antitrust Injury,* 47 U.Chi.L.Rev. 467, 479 n. 60 (1980).